Opinion issued July 7, 2005








     






In The
Court of Appeals
For The
First District of Texas




NOS. 01–05–00146–CV
          01–05–00147–CV




J.M., Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the Probate Court 
Galveston County, Texas 
Trial Court Cause Nos. 2428 and 2428A




O P I N I O N 

          In these two accelerated appeals, appellant, J.M, raises three issues challenging
the trial court’s separate orders (1) that J.M. be involuntarily committed for temporary
inpatient mental health services


 and (2) that she be administered psychoactive
medications.


 J.M. contends that the evidence presented by the State at her commitment
hearing is legally and factually insufficient to support the findings on which the order
for temporary inpatient treatment is based. Concomitantly, J.M. also contends that the
trial court’s order to administer psychoactive medication must be reversed because such
an order cannot stand unless a proper order for inpatient mental health services is also
in place.
          Because the evidence was legally insufficient to support the commitment order,
we reverse and render judgment in both appeals.
Background
          On December 7, 2004, J.M. was brought to the University of Texas Medical
Branch Hospital (“UTMB”) in Galveston by her sister, with whom J.M. lived. The
sister reported that J.M. suffered from bipolar disorder and that J.M. had not been taking
her medication. The sister also reported that J.M. had been aggressive, attempting to
kick family members, including some children. According to the sister, J.M. also had
threatened suicide. The sister further reported that J.M. had been neglecting her
personal hygiene by neither bathing nor brushing her teeth. At that point, J.M. was
admitted to UTMB for inpatient care.
          On December 21, 2004, Dr. Mireya Silva signed an application for court-ordered
temporary mental health services, which was filed with the trial court. As applicant, Dr.
Silva requested the trial court to involuntarily commit J.M. to the Austin State Hospital
for a period not to exceed 90 days. The application was supported by two certificates
of medical examination: one prepared by Dr. Silva and one by Dr. Waheedul Haque. 
Both doctors stated that they had examined J.M. and diagnosed her with bipolar disorder
and depression with psychotic factors. With regard to the specific factual bases
underlying J.M.’s need for commitment, both doctors referred to J.M.’s aggression
toward her family and her refusal to take a bath or brush her teeth. Drs. Silva and Haque
also stated that, while at UTMB, J.M. refused medication, refused to get out of bed, and
remained mute for several days.
          J.M.’s commitment hearing was held on December 29, 2004. Dr. Haque testified
for the State. He restated his diagnosis that J.M. is mentally ill, suffering from “bipolar
disorder mixed with psychotic features.” Dr. Haque testified that his opinion is based
on his personal knowledge of J.M. and from her medical records. J.M.’s medical
records from her UTMB inpatient stay were also admitted into evidence.
          When asked whether J.M. was likely to cause harm to herself, Dr. Haque
responded affirmatively. He also responded affirmatively when asked whether J.M. (1)
was “suffering from severe and abnormal mental, emotional, or physical distress” and
(2) was “experiencing substantial mental or physical deterioration of her ability to
function independently.” Dr. Haque agreed that J.M.’s “deterioration” was exhibited
by her inability to provide “for basic needs like food, clothing, health, or safety.” Dr.
Haque also agreed that J.M. was not able “to make a rational and informed decision
about whether or not to submit to treatment.” 
          According to Dr. Haque, J.M. was also a danger to others. Dr. Haque based this
opinion on the information provided by J.M.’s sister that J.M. had been violent at home
before her admission. Dr. Haque testified that J.M. had not shown any violent,
aggressive, or threatening behavior while hospitalized. 
          Dr. Haque acknowledged that J.M. alleges that the sister who brought her to the
hospital was trying to steal from her and had been abusing her. J.M told Dr. Haque that
her family had brought her to the hospital because she would not give them money. Dr.
Haque stated that he did not believe J.M., but agreed that it was possible that the
allegations against J.M.’s family were true. Dr. Haque also acknowledged that the sister
against whom J.M. made the allegations of abuse was the source of much of the
information on which he relied regarding J.M.’s mental health history.
          J.M. also testified at the commitment hearing. She stated that, for the past 10
years, she had been treated with medication on an outpatient basis for depression and
bipolar disorder. She testified that, during that time, she had worked as a nurse and led
a normal life. J.M. stated that she had helped her family financially during that time and
had made her sister’s car payments. J.M. testified that she had not been working
recently but that she was living from her savings. J.M. admitted that she had been
previously hospitalized but would not directly admit that it had been for psychiatric care.
          J.M. had moved from Houston to La Marque the previous year because her 16-year-old daughter was not doing well in school. J.M. and her daughter lived in her
sister’s house along with another sister and both sisters’ children. Once at La Marque
High School, her daughter excelled, and J.M. decided to stay in La Marque. 
          J.M. testified that she paid the utility bills and spent $400 a month on groceries
while living in her sister’s home. J.M. also testified that she cooked all the meals and
babysat her sister’s daughter while her sister attended school.
          J.M. claimed that she never struck any of her family members; rather, J.M.
testified that her sister had struck her when J.M. refused to give the sister money. 
According to J.M., the sister had told her, “Either you give us money or I will have you
locked up.” J.M. told the trial court that she was in the process of finding another place
to live with her daughter when she was hospitalized at UTMB.
          At the conclusion of the commitment hearing, the trial court, as factfinder, found
that J.M. was mentally ill. It also found that J.M. was “likely to cause serious harm to
herself and that at this time she is suffering from a mental, emotional, or physical
distress and is unable to function independently.” As a result, the trial court signed an
“Order For Temporary Inpatient Mental Health Services,” in which the trial court
ordered J.M. committed to the Austin State Hospital for a period not to exceed 90 days.
          Immediately following the commitment hearing, the trial court conducted a
hearing on the State’s application to administer psychoactive medication, which had
been filed at the same time as the commitment application. Dr. Haque testified that the
administration of psychoactive medication was in J.M.’s best interest and was the proper
course of treatment for her. According to Dr. Haque, J.M.’s condition would deteriorate
if she did not take psychoactive medication. At the conclusion of the hearing, the court
signed an “Order to Administer Psychoactive Medication,” providing that certain classes
of psychoactive medications could be administered to J.M. for the duration of her
temporary commitment.
          J.M. appeals both the “Order For Temporary Inpatient Mental Health Services”
and the “Order to Administer Psychoactive Medication.” 
          Appeals from Orders are Not Moot
          As a preliminary matter, we discuss our jurisdiction to decide these two appeals. 
This issue arises because the specified term of both orders—a period not to exceed 90
days—has expired. Thus, the question becomes whether J.M.’s appeals are moot. In
State v. Lodge, the supreme court held that the doctrine of mootness does not apply to
appeals from involuntary commitments for temporary hospitalization. 608 S.W.2d 910,
912 (Tex. 1980); see Johnstone v. State, 22 S.W.3d 408, 409 n. 1 (Tex. 2000) (citing
Lodge for this proposition). In reaching its holding, the Lodge court concluded that the
“collateral consequences” exception to the mootness doctrine applies to temporary
commitment orders. Lodge, 608 S.W.2d at 912. The collateral consequence in this
context is the stigma that attaches to a mental health commitment. See id. The Lodge
court explained that a “commitment to a mental hospital can engender adverse social
consequences to the individual whether it is labeled a stigma or if it is called something
else.” Id. at 912 (internal quotation omitted). Such a stigma continues even after release
is obtained. See id. For this reason, the Lodge court summarized as follows: 
[W]e cannot agree that the reversal of the lower court judgment and
dismissal of the cause as moot removes the collateral consequences of a
commitment for mental health to the same extent as the reversal of the
judgment after appellate review and the pronouncement in writing of the
considerations impelling the decision favorable to the aggrieved party.

Id.
          The next logical question is whether the underlying reasoning of the supreme
court’s holding in Lodge can be extended to J.M.’s appeal from the order to administer
psychoactive medication. We conclude that it can be. 
          Only two other Texas courts of appeal have determined whether an appellate court
has jurisdiction to decide an appeal from an order to administer psychoactive medication
when the term of the order has expired. In this regard, the San Antonio Court of
Appeals discussed in a footnote that the analysis found in Lodge extends to an order
compelling psychoactive medication and concluded that an appeal from such an order
is not moot. See In re R.M., 90 S.W.3d 909, 910 n. 1 (Tex. App.—San Antonio 2002,
no pet.). 
          In contrast, the Beaumont Court of Appeals held, in a per curiam opinion, that
such an appeal is moot and dismissed the appeal for lack of jurisdiction. See In re E.B.,
962 S.W.2d 304, 305 (Tex. App.—Beaumont 1998, no pet.) The E.B. court recognized
that Texas Health and Safety Code section 574.108 provides that a patient may appeal
an order authorizing the administration of psychoactive medication in the same manner
as provided for an appeal of an order requiring court-ordered mental health services. 
Id. (citing Tex. Health & Safety Code § 574.108). Following this recognition, the
court observed, “Though § 574.108 appears to offer appellant some form of due process,
in actual practice, however, it does not, for by the time appeal is perfected and briefs
filed, the commitment order most likely has expired by its own terms.”


 Id. Without
further reasoning or discussion, the E.B. court concluded that the appeal was moot and
dismissed it accordingly, without mentioning or expressly considering the apposite
opinion in Lodge. Id. Because E.B. does not consider Lodge, which squarely addresses
the very concern raised in E.B., we decline to follow E.B.’s holding. 
          In this case, the trial court’s order to administer psychoactive medication states,
inter alia, that J.M. is subject to court-ordered inpatient mental health services and that
J.M. has been determined by the trial court to be “mentally ill.” The order also states
that J.M.’s “mental illness renders [her] incapable of making medicinal decisions.” The
order provides that the State could administer the following classes of psychoactive
medication to J.M.: antidepressants, antipsychotics, anxiolytics/sedatives/hypnotics,
mood stabilizers, and stimulants. Given this language, we conclude that the reasoning
of Lodge applies equally to J.M.’s appeal of the medication order. See Lodge, 608
S.W.2d at 912. That is, the stigma attached to being subject to an order to administer
psychoactive medication, like that of an order for inpatient mental health treatment, is
a collateral consequence that continues even after the term of the order has expired. See
id. Accordingly, we conclude that we have jurisdiction over J.M.’s appeal of the order
to administer psychoactive medication.
          Having determined that we possess jurisdiction over these appeals, we turn to the
merits of J.M.’s appellate challenges to the trial court’s order for temporary commitment
and to the order to administer psychoactive medication.
 
Order for Temporary Commitment 
A.      Burden of Proof
          We have recognized that “a person may not be deprived of his liberty by a
temporary involuntary commitment unless there is a showing of a substantial threat of
future harm to himself or others.” Taylor v. State, 671 S.W.2d 535, 538 (Tex.
App.—Houston [1st Dist.] 1983, no writ). To obtain an order for temporary
commitment, the Texas Legislature has mandated that the State must prove its case by
clear and convincing evidence. See Tex. Health & Safety Code Ann. § 574.034
(Vernon 2003). In this context, “clear and convincing evidence” means “that measure
or degree of proof which will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.” State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979). Specifically, Health and Safety Code
subsection 574.034(a) provides that, on application for court-ordered temporary
inpatient mental health services, the State must prove, by clear and convincing evidence,
that the proposed patient is mentally ill. Tex. Health & Safety Code Ann. §
574.034(a). The State must also prove, by clear and convincing evidence, at least one
of the following three criteria: 
(2) as a result of that mental illness the proposed patient: 
 
(A) is likely to cause serious harm to himself; 
 
(B) is likely to cause serious harm to others; or 

(C) is: 
 
(i)suffering severe and abnormal mental, emotional, or
physical distress; 

(ii)experiencing substantial mental or physical
deterioration of the proposed patient’s ability to function
independently, which is exhibited by the proposed patient’s
inability, except for reasons of indigence, to provide for the
proposed patient’s basic needs, including food, clothing,
health, or safety; and 
 
(iii)unable to make a rational and informed decision as to
whether or not to submit to treatment. 

Id.
          Subsection 574.034(c) requires that the trial court specify which of the three
criteria found in subsection (a) forms the basis of the commitment order, and our review
is limited to the one(s) actually identified. Tex. Health & Safety Code Ann. §
574.034(c); see Johnstone v. State, 961 S.W.2d 385, 388 (Tex. App.—Houston [1st
Dist.] 1997, no writ). In this case, the trial court made findings under the first and third
criterion. See Tex. Health & Safety Code Ann. § 574.034(a)(2)(A), (C)(i)–(iii). 
That is, the commitment order reflects that the trial court, as fact finder in this case,
found that J.M. (1) is likely to cause serious harm to herself and (2) (i) is suffering
severe and abnormal mental, emotional, or physical distress; (ii) is experiencing
substantial mental or physical deterioration of her ability to function independently,
which is exhibited by the proposed patient’s inability, except for reasons of indigence,
to provide for her basic needs, including food, clothing, health, or safety; and (iii) is
unable to make a rational and informed decision as to whether or not to submit to
treatment. See id.
          The Health and Safety Code requires that, to be clear and convincing under
subsection 574.034(a), the evidence must include expert testimony and, unless waived,
evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: 
(1)the likelihood of serious harm to the proposed patient or others; or 
(2)the proposed patient’s distress and the deterioration of the proposed
patient’s ability to function.”


 

Id. § 574.034(d). The trial court need not specify which basis for clear and convincing
evidence listed in subsection 574.034(d) supports its subsection 574.034(a) findings. 
M.S. v. State, 137 S.W.3d 131, 135 n.5 (Tex. App.—Houston [1st. Dist.] 2004, no pet.). 
J.M. contends that the evidence is neither legally nor factually sufficient to show an
overt act or a continuing pattern of behavior of the type defined in subsection
574.034(d).
B.      Standards of Review
          Reaffirming its holding in In re J.F.C., 96 S.W.3d 256, 264–65 (Tex. 2002), the
Texas Supreme Court recently held in Southwestern Bell Telephone Co. v. Garza that
whenever the burden of proof is heightened beyond a mere preponderance of the
evidence, e.g., when a fact must be proved by clear and convincing evidence, then the
standard for legally sufficient evidence will be correspondingly heightened. No.
01–1142, 2004 WL 3019205, at *15 (Tex. Dec. 31, 2004); accord Diamond Shamrock
Refining Co. v. Hall, No. 02–0566, 2005 WL 119950, at *5 (Tex. Jan. 21, 2005)
(applying J.F.C. heightened standard of review when burden in trial court was by clear
and convincing evidence). As detailed, the State in this case was required to prove at
least one of the criteria listed in subsection 574.034(a) by clear and convincing
evidence. Because the clear and convincing standard of proof in this case is the same
as that involved in Garza and J.F.C., we must apply the elevated standard of review
defined in J.F.C. to determine whether the State presented legally sufficient evidence
to support J.M.’s temporary commitment.


 See Garza, 2004 WL 3019205, at *15. In
this regard, we are guided by the following language from J.F.C.:
In a legal sufficiency review, a court should look at all the evidence in the
light most favorable to the finding to determine whether a reasonable trier
of fact could have formed a firm belief or conviction that its finding was
true. To give appropriate deference to the factfinder’s conclusions and the
role of a court conducting a legal sufficiency review, looking at the
evidence in the light most favorable to the judgment means that a
reviewing court must assume that the factfinder resolved disputed facts in
favor of its finding if a reasonable factfinder could do so. A corollary to
this requirement is that a court should disregard all evidence that a
reasonable factfinder could have disbelieved or found to have been
incredible. This does not mean that a court must disregard all evidence
that does not support the finding. Disregarding undisputed facts that do
not support the finding could skew the analysis of whether there is clear
and convincing evidence.
96 S.W.3d at 266. If, after conducting its legal sufficiency review of the record
evidence, a court determines that no reasonable factfinder could form a firm belief or
conviction that the matter that must be proven is true, then that court must conclude that
the evidence is legally insufficient. Id.
          Likewise, the higher burden of proof alters the appellate standard of factual
sufficiency review. See In re C.H., 89 S.W.3d 17, 25–26 (Tex. 2002) (holding that
traditional factual sufficiency standard, in which court determines if finding is so against
great weight and preponderance of evidence that it is manifestly unjust, shocks the
conscience, or clearly demonstrates bias, is inadequate when finding must be based on
clear and convincing evidence). In reviewing the evidence for factual sufficiency under
the clear and convincing standard, we inquire “whether the evidence is such that a
factfinder could reasonably form a firm belief or conviction about the truth of the State’s
allegations.” Id. at 25. In so doing, we must give due consideration to evidence that the
factfinder reasonably could have found to be clear and convincing. Id. at 25. If, in light
of the entire record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a fact finder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient. 
J.F.C., 96 S.W.3d at 266. 
C.      Legal Sufficiency of Evidence to Support Temporary Commitment Order
          J.M. does not contest the trial court’s finding that she is mentally ill. Rather, J.M.
first contends that the State did not present legally sufficient evidence to show “a recent
overt act” or a “continuing pattern of behavior” that tends to confirm either (1) the
likelihood that J.M. would cause serious harm to herself or (2) J.M.’s distress and the
deterioration of her ability to function to provide for her own basic needs, as required
by subsection 574.034(d). See Tex. Health & Safety Code Ann. § 574.034(d). 
          Undeniably, Dr. Haque’s testimony tracked the language found in section
574.034. However, an expert opinion recommending involuntary commitment must be
supported by the factual bases on which it is grounded and not simply recite the
statutory criteria. See K.T. v. State, 68 S.W.3d 887, 893 (Tex. App.—Houston [1st Dist.]
2002, no pet.); In re Breeden, 4 S.W.3d 782, 784 (Tex. App.—San Antonio 1999, no
pet.). That is, the expert should describe the patient’s specific behaviors on which his
or her opinion is based. See In re K.D.C., 78 S.W.3d 543, 550 (Tex. App.—Amarillo
2002, no pet.). It is well-established that evidence establishing that an individual is
mentally ill and in need of hospitalization is not evidence that the statutory standard for
involuntary commitment has been satisfied. K.T., 68 S.W.3d at 892; Johnstone, 961
S.W.2d at 388–89.
          With these principles in mind, we turn to the evidence offered by the State as clear
and convincing proof that J.M. should be subject to temporary mental health services. 
          Dr. Haque testified that he had learned from J.M.’s sister that J.M. had exhibited
aggressive behavior toward her family before J.M. was hospitalized. J.M.’s UTMB
medical records confirm that this information was reported by the family. J.M.’s
aggressiveness toward her family may be evidence of an overt act. However, the recent
overt act or continuing pattern of behavior proven by the State must relate to the
criterion on which the judgment is based. In re C.O., 65 S.W.3d 175, 181 (Tex.
App.—Tyler 2001, no pet). Here, the trial court did not find that J.M. is likely to cause
harm to others. Such evidence of J.M.’s aggressiveness toward her family does not tend
to confirm the likelihood that J.M. would cause serious harm to herself or J.M.’s distress
and the deterioration of her ability to care for herself. See In re N.D, No.
12–04–00186–CV, 2004 WL 2955853, at *4 (Tex. App.—Tyler Dec. 22, 2004, no pet.)
(mem. op.) (concluding that evidence of appellant’s threat to stab husband is not
evidence supporting commitment when trial court, as factfinder, made no finding that
appellant was threat to others). Moreover, Dr. Haque testified, and her medical records
indicate, that during her hospitalization J.M. exhibited no violent or aggressive
behavior. 
          As pointed out by the State, J.M.’s medical records also indicate that J.M.’s
family reported that she threatened suicide before her hospitalization. The records also
reflect that J.M. was placed on suicide precautions during her hospitalization at UTMB. 
However, a threat of harm to the patient or others must be substantial and based on
actual dangerous behavior manifested by some overt act or threats in the recent past. 
K.D.C., 78 S.W.3d at 547. Here, no specific details were provided about the purported
threats of suicide made by J.M. before her admission to UTMB. The record does not
reveal exactly when the threats were made, specifically to whom they were made, under
what circumstances the threats were made, or their severity. Importantly, no evidence
was presented that J.M. engaged in any recent overt act to actually harm herself at the
time she made the threats or during her hospitalization.


 See Broussard v. State, 827
S.W.2d 619, 622 (Tex. App.—Corpus Christi 1992, no writ) (concluding that expert
opinion of “potential danger” to others is not sufficient to support commitment); In re
P.W., 801 S.W.2d 1, 3 (Tex. App.—Fort Worth 1990, writ denied) (reversing
commitment order despite evidence that, inter alia, appellant called cousin asking about
how to hold pistol to kill herself without causing a lot of pain). In fact, J.M.’s medical
records indicate that she neither engaged in harmful behavior toward herself nor
exhibited suicidal ideation during her three-week hospitalization at UTMB. 
          J.M.’s medical records also indicate that J.M.’s failure to take her medication was
one of the reasons given by the family for bringing J.M. to UTMB. Dr. Haque testified
that J.M. “often but not always” refused to take her medication.


 This was cited by Dr.
Haque as a factual basis confirming J.M.’s distress and deterioration of her ability to
function. 
          This Court has previously held that refusal of medication is insufficient evidence
of an overt act or a continuing pattern of behavior that demonstrates the patient’s
distress and the deterioration of the patient’s ability to function. Johnstone, 961 S.W.2d
at 389. Other appellate courts have arrived at the same conclusion despite evidence of
mental illness. See, e.g., In re I.H., No. 12–03–00222–CV, 2004 WL 527887, at *5
(Tex. App.—Tyler Mar. 17, 2004, no pet.) (mem. op.) (holding no evidence of overt act
or continuing pattern of behavior that tended to confirm appellant’s distress and
deterioration of her ability to function, even though evidence presented showed that
appellant thought people lived in her attic that were trying “to get her,” appellant
believed that her husband had artificially inseminated her, and appellant refused to take
her medication because she believed it would harm baby); Breeden, 4 S.W.3d at 789
(reversing commitment order of schizophrenic patient who heard voices, refused
medication, and was not eating properly); Broussard, 827 S.W.2d at 622 (concluding
State presented no evidence of overt act or continuing pattern of behavior that
demonstrated distress and deterioration of appellant’s ability to function, even though
paranoid schizophrenic patient refused medication because she believed it was
poisonous). But see In re G.H., 94 S.W.3d 115, 116–17 (Tex. App.—Houston [14th
Dist.] 2002, no pet.) (divided panel affirmed temporary commitment order when
evidence showed appellant refused medication).


 Moreover, in this case, the State
offered no evidence indicating what medication J.M. needed or what effect J.M.’s
refusal to take the medication had on her ability to function. Like we did in Johnstone,
we conclude that J.M.’s refusal to take her medication is legally insufficient evidence
of an overt act or a continuing pattern of behavior that demonstrates J.M.’s distress and
the deterioration of her ability to function. See 961 S.W.2d at 389.
          Dr. Haque also testified that J.M.’s “refusal to cooperate with treatment” was an
example of an overt act or a continuing pattern of behavior that demonstrated J.M.’s
distress and the deterioration of her ability to function. Specifically, Dr. Haque cited
J.M.’s refusal to allow the hospital staff to take her vital signs or to draw her blood for
laboratory analysis. Dr. Haque testified that the vital signs and lab work were necessary
to aid in J.M.’s diagnosis. However, the State never related—and it is not implicitly
obvious—how this evidence showed a deterioration of J.M.’s ability to function
independently to provide for her own basic needs. Although Dr. Haque’s opinion might
be valid, the legislature has mandated that more than conclusory expert opinions are
required before a person may be involuntarily committed for inpatient mental health
services. Evidence that J.M. refused to have her vital signs taken and blood drawn, like
her refusal to take medication, is not evidence of an overt act or continuing pattern of
behavior that would generally affect J.M.’s ability to function independently on a day-to-day basis without the imposition of court-ordered mental health services. 
          In sum, Dr. Haque’s reliance on J.M.’s refusal to cooperate with treatment as a
basis for hospitalization employs tautological reasoning that is insufficient to support
commitment. To employ such reasoning would be, in essence, to say that someone can
be involuntarily committed and treated because the evidence shows that the patient will
not be voluntarily treated. Evidence supporting such circular reasoning is not legally
sufficient to support a deprivation of J.M.’s liberty by temporary involuntary
commitment. 
          The State also asked Dr. Haque to give examples of J.M.’s behavior indicating
a recent overt act or a continuing pattern of behavior that confirms the likelihood that
J.M. will cause serious harm to herself. In response, Dr. Haque cited (1) J.M.’s refusal
to bathe and brush her teeth, (2) J.M.’s refusal to get out of bed for several days at a
time, and (3) J.M.’s refusal to talk to the staff at the hospital, i.e., remaining mute. We
cannot agree that such conduct rises to the level of a sufficient act or pattern of behavior
to support court-ordered mental health services. 
          No evidence was presented that J.M.’s behavior resulted in any harm to her. 
J.M.’s medical records, on which Dr. Haque testified that he relied to form his opinion,
indicate that J.M. was “seclusive” and “isolatory,” and that J.M. spent much time in bed
or in her room. The nursing notes state that J.M. would come out of her room to eat and
to take her medication. Dr. Haque testified, and the medical records show, that J.M. had
no problem eating while in the hospital. A number of entries in the nursing notes state
that J.M. was out of bed and sitting in the hospital’s “day room.” 
          The medical records indicate that J.M. refused to answer questions related to her
condition when asked by the medical staff and was generally non-communicative. One
entry described J.M. as “selectively” mute. Another entry in the progress notes indicates
that J.M. told one of the staff members that she did not want to talk to the staff because
she had nothing to say to them. Notes in the medical records also contain entries
detailing comments made by J.M. during conversations that she had with the staff. 
However, what is lacking in the State’s evidence is how J.M.’s proclivity to stay in bed
and her “muteness” tended to confirm either the likelihood that she would harm herself
or the deterioration of J.M.’s ability to function independently to provide for her own
basic needs. See In re R.L.I., 132 S.W.3d 539, 542–44 (Tex. App.—Tyler 2004, no pet.)
(reversing temporary commitment order on legal insufficiency grounds where evidence
showed, inter alia, that appellant was delusional, paralyzed by fear of dying, refused to
get out of bed, and had difficulty communicating with people).
          Dr. Haque testified that poor hygiene could result in infection. On cross-examination, Dr. Haque testified that not bathing is an indication that a person is “not
taking care of themselves [sic].” According to Dr. Haque, not bathing can lead to “ill
health” and “infections.” When questioned how that would happen, Dr. Haque
responded, “By not taking a bath for six months, you will know what happens.” 
However, nothing in the record indicates that J.M. had not bathed for six months. To
the contrary, nursing notes in J.M.’s medical records indicate that, while she did not
engage in regular personal hygienge, J.M. took care of her own “oral hygiene” and
“personal hygiene” on December 19 and 23, 2004. The nursing notes from the 19th
stated that J.M. attended to her hygiene “without prompting” on that date. Moreover,
even assuming that J.M.’s poor hygiene might result in physical problems at some point,
to justify depriving an individual of her liberty, more than “potential” harm is necessary. 
See C.O., 65 S.W.3d at 181–82.
          When faced with evidence very similar to the evidence presented in this case, i.e.,
poor hygiene and “oppositional behavior,” the Tyler Court of Appeals, in In re B.S.,
concluded that such evidence merely demonstrated the appellant’s mental illness, but
did not rise to the level of being an overt act or pattern of behavior that demonstrated
distress or tended to confirm a substantial deterioration of the appellant’s ability to
provide for his own basic needs. No. 12–02–00217–CV, 2003 WL 21260028, at *5
(Tex. App.—Tyler 2003, no pet.) (mem. op.). Similarly, though the evidence adduced
at the commitment hearing demonstrates J.M.’s mental illness, it is not clear and
convincing evidence that J.M. was a serious danger to herself or that she could not
provide for her own basic needs, as found by the trial court. 
          Considering the evidence as we must, we conclude that a reasonable trier of fact
could not have formed a firm belief or conviction that J.M. was likely to cause serious
harm to herself or that J.M. is experiencing substantial mental or physical deterioration
of her ability to function independently to provide for her basic needs. See Tex.
Health & Safety Code Ann. § 574.034(a)(2)(A),(C)(ii); see also id. § 574.034(d). 
Accordingly, we hold that the evidence is legally insufficient to support the trial court’s
Order For Temporary Inpatient Mental Health Services.


 
          J.M.’s first and third issues are sustained to the extent that they challenge the legal
sufficiency of the temporary commitment order.
Order to Administer Psychoactive Medication
          J.M. correctly contends that we must reverse the order to administer psychoactive
medication to J.M. if the commitment order is reversed. An order authorizing the
administration of psychoactive medication may be entered only if the patient is under
a valid order for temporary or extended mental health services. See Tex. Health &
Safety Code Ann. § 574.106(a)(1) (Vernon 2003). In the absence of a valid order for
temporary or extended mental health services, the order authorizing the administration
of psychoactive medication is not authorized by statute. See id. Therefore, because we
reverse the trial court’s order of temporary commitment, we also reverse the order to
administer psychoactive medications to J.M. See K.T., 68 S.W.3d at 894. We sustain
J.M.’s issues to the extent that they challenge the medication order on this ground.



                                                           Conclusion
          As well-stated by the Broussard court, “While we are reluctant to deny court-ordered treatment to a woman who is obviously ill, we cannot lower the requirements
imposed under section 574.034(c) of the Texas Mental Health Code regarding proof by
clear and convincing evidence.” Broussard, 827 S.W.2d at 622. The evidence offered
in this case to support the commitment order was not clear and convincing evidence that
J.M. would likely cause herself serious harm or that her condition had deteriorated to
the point that she could not provide for her own basic needs. Accordingly, we reverse
the Order For Temporary Inpatient Mental Health Services and the Order to Administer
Psychoactive Medication signed by the trial court, and we render judgment denying the
State’s applications to commit appellant for court-ordered temporary mental health
services and to administer psychoactive medications to J.M.




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Taft, Alcala, and Higley.