Opinion issued December 31, 2008

















In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-08-00371-CV

NO. 01-08-00372-CV

____________


K.E.W.


V.


THE STATE OF TEXAS







On Appeal from the Probate Court of 

Galveston County, Texas

Trial Court Cause Nos. 3318 & 3318A






CORRECTED DISSENTING OPINION


 I respectfully dissent. In these two accelerated appeals, the majority reverses
the judgment of the trial court ordering temporary inpatient mental health services
and the trial court's order to administer psychoactive medications to appellant,
K.E.W., a paranoid schizophrenic. I believe the State fully satisfied the statutory
criteria for proving from clear and convincing evidence that at the time of his
involuntary commitment, appellant was mentally ill and, as a result, was likely to
cause serious harm to others, was suffering severe and abnormal mental and
emotional distress, and was unable to make a rational informed decision as to whether
or not to submit to treatment, and, therefore, should be involuntarily committed to
inpatient psychiatric services. (1) My dissent is broader than this one case, however. 

 The majority opinion carries forward a recently developed line of cases in this
Court that, in my view, misconstrues the "clear and convincing" standard of proof of
involuntary psychiatric commitment, set out in section 574.034 of the Texas Health
and Safety Code, in contravention of the purpose and plain language of the statute,
raising the standard so high that a commitment order cannot survive a legal or factual
sufficiency challenge in this Court. The result is the routine overturning of the
involuntary commitments of mentally ill patients who present immediate threats to
their own health and welfare and the safety of the community and the generation of
a direct conflict with our sister court, the Fourteenth Court of Appeals, demonstrating
the arbitrary and capricious application of the statute. I would affirm both the
judgment of the trial court ordering temporary inpatient mental health services and
the order to administer psychoactive medications to appellant, rather than reversing
both.

Analysis

 Section 574.034 of the Texas Health and Safety Code, governing orders for
temporary mental health services, provides as follows for involuntary commitment
to inpatient mental health services:

 (a) The judge may order a proposed patient to receive court-ordered
temporary inpatient mental health services only if the judge or
jury finds, from clear and convincing evidence, that: 


 (1) the proposed patient is mentally ill; and 


 (2) as a result of that mental illness, the proposed patient:

 

 (A) is likely to cause serious harm to himself;


 (B) is likely to cause serious harm to others; or


 (C) is: 


 (i) suffering severe and abnormal mental,
emotional, or physical distress; 


 (ii) experiencing substantial deterioration of the
proposed patient's ability to function
independently, which is exhibited by the
proposed patient's inability, except for
reasons of indigence, to provide for the
proposed patient's basic needs, including
food, clothing, health, or safety; and


 (iii) unable to make a rational and informed
decision as to whether or not to submit to
treatment.


 . . . .


 (c) If the judge or jury finds that the proposed patient meets the
commitment criteria prescribed by Subsection (a), the judge or
jury must specify which criterion listed in Subsection (a)(2) forms
the basis for the decision.


 (d) To be clear and convincing under subsection (a), the evidence
must include expert testimony and, unless waived, evidence of a
recent overt act or a continuing pattern of behavior that tends to
confirm: 


 (1) the likelihood of serious harm to the proposed patient or
others; or


 (2) the proposed patient's distress and the deterioration of the
proposed patient's ability to function.

 . . . .


 (f) The proposed patient and the proposed patient's attorney, by a
written document filed with the court, may waive the right to
cross-examine witnesses, and, if that right is waived, the court
may admit, as evidence, the certificates of medical examination
for mental illness. The certificates admitted under this subsection
constitute competent medical or psychiatric testimony, and the
court may make its findings solely from the certificates. If the
proposed patient and the proposed patient's attorney do not waive
in writing the right to cross-examine witnesses, the court shall
proceed to hear testimony. The testimony must include
competent medical or psychiatric testimony. In addition, the
court may consider the testimony of a non-physician mental
health professional as provided by Section 574.031(f).


 . . . .


Tex. Health & Safety Code Ann. § 574.034 (Vernon 2003) (emphasis added). 

 In construing the "clear and convincing" standard of review set out in
subsection 574.034(d), the majority opinion states:

 [A]n expert opinion recommending involuntary commitment must be
supported by the showing of the factual bases on which it is grounded
and not simply recite the statutory criteria. Id.; K.T. v. State, 68 S.W.3d
887, 893 (Tex. App.--Houston [1st Dist.] 2002, no pet.). Thus the
expert should describe the specific behaviors of the proposed patient on
which the expert's opinion is based. See In re K.D.C., 78 S.W.3d 543,
550 (Tex. App.--Amarillo 2002, no pet.). It is also well established that
evidence that merely reflects that a person is mentally ill and in need of
hospitalization is no evidence that the statutory standard for involuntary
commitment has been met and will not suffice to support the statutory
requirement for an overt act or continuing pattern of behavior. See
J.M., 178 S.W.3d at 194-96; G.H. v. State, 96 S.W.3d 629, 634 (Tex.
App.--Houston [1st Dist.] 2002, no pet.); K.T., 68 S.W.2d at 892;
Johnstone, 961 S.W.2d at 388-90.


K.E.W. v. State, Nos. 01-08-00371-CV & 01-08-00372-CV, slip. op. at 12-13 (Tex.
App.--Houston [1st Dist.] Dec. 31, 2009, no pet. h.) (emphasis added); see also M.S.
v. State, 137 S.W.3d 131, 135 (Tex. App.--Houston [1st Dist.] 2004, no pet.). 

 I acknowledge that cases upon which the majority relies do count expert
testimony that "merely reflects that a person is mentally ill and in need of
hospitalization" as "no evidence" or insufficient evidence to justify involuntary
commitment. The majority's error, however, is to misconstrue expert and fact witness
testimony that "describe[s] the specific behaviors of the proposed patient," his "recent
overt act[s]," and "a continuing pattern of behavior that tends to confirm: either (1)
the likelihood of serious harm to the proposed patient or others; or (2) the proposed
patient's distress and the deterioration of the proposed patient's ability to function"
as "merely" evidence that "a person is mentally ill and in need of hospitalization"
and, therefore, as no evidence satisfying the standard of proof for involuntary
commitment. On this interpretation of the evidentiary requirement, nothing can
satisfy the "clear and convincing evidence" standard of proof required for involuntary
commitment under section 574.034(d).

 By its plain language, subsection 574.034(d) requires "clear and convincing . . .
expert testimony and, unless waived, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm: [either] (1) the likelihood of serious harm
to the proposed patient or others; or (2) the proposed patient's distress and the
deterioration of the proposed patient's ability to function." Tex. Health & Safety
Code Ann. § 574.034(d). It thus plainly seeks to assure that a person is not deprived
of his liberty and committed to involuntary medical care unless he has been evaluated
by a medical expert and has not merely been shown by a description of his overt acts
or pattern of behavior to satisfy a clinical standard of a mentally ill person but has
demonstrated that his confinement and treatment are necessary for his own safety or
that of others or for his well-being because of his demonstrated dangerousness or
distress and inability to function. It is absurd to read the statute as stating that the
expert testimony of a proposed patient's treating physician of recent overt acts
(including statements and agitated behavior) demonstrating the proposed patient's
danger to others and a pattern of behavior that tends to confirm the patient's distress
and inability to function are no evidence under the statute because they come from
experts who have recently observed and treated the proposed patient and who are
trained to recognize the indicia of dangerousness and dysfunction caused by mental
illness.

 What the majority has actually done, by reading the statute and prior case law
in this way, is to substitute its own unsupported lay conclusions as to the
dangerousness of K.E.W. and his ability to function for the inferences that can
reasonably be drawn from the record. That is, the majority simply disregards as
irrelevant or "insufficient" the testimony of the personnel who witnessed appellant's
search for his step-daughter at the MHMR and the opinions of K.E.W.'s doctors
based on treatment sessions with K.E.W., and, relying on nothing at all but its
interpretation of the requirements of past case law, the majority concludes that at the
time of the commitment hearing K.E.W. was not shown to be dangerous to others or
distressed and unable to function. Not a scintilla of evidence from the record
supports the majority's conclusion that K.E.W. was not shown to be dangerous or
distressed and unable to function. Indeed, the record contradicts the majority's
conclusion.

 Michael Fields, an employee of the Gulf Coast Center MHMR where appellant
was searching for his stepdaughter, testified at the commitment hearing that he was
present when K.E.W. came into the Center on the day of the incident. When asked
to "describe what behaviors you saw him engage in," he testified:

 [Mr. Fields]: He was--he appeared to be extremely paranoid. He
was difficult to redirect. I noticed a lot of pacing on
his part. He was also asking numerous times for a
certain female staff that worked there, and we ended
up having to place her in the back behind a closed
door until we were able to have [K.E.W.] escorted
off by the mental health deputies. . . .


 . . . .


 [The State]: As a result of those behaviors you had to call the
police?


 [Mr. Fields]: Yes, the police were called out and at one point they
had to place him in the back of the vehicle because,
again, he was uncooperative. And I am assuming
that was probably for his safety as well as others. The following testimony by Dr. Michael Stone, one of K.E.W.'s treating
psychiatrists, is likewise illustrative of the evidence the majority finds to be "no
evidence" of "a recent overt act or a continuing pattern of behavior" tending to show
either "the likelihood of serious harm" by appellant to himself or others or appellant's
"distress and the deterioration of [his] ability to function." See Tex. Health &
Safety Code Ann. § 574.034(d). Dr. Stone testified that he psychiatrically
evaluated K.E.W. when he was involuntarily committed and that K.E.W. suffered
from schizophrenia. When asked on cross-examination whether he could give an
example of "either his behaviors or what he said directly to you" that led him to the
opinion K.E.W. was a danger to others, Dr. Stone testified:

 [Dr. Stone]: Yes. He has said to me on several occasions in
talking to him that he believes that there are a flock
or group of women, including his step-daughter,
who he is--who he needs to find and impregnate. 
He needs to find these women and impregnate them. 
He said he needs to marry his step-daughter and
impregnate her, as well.


 . . . .


 [The State]: Any other behaviors that alerted you or makes you
believe that he could be a harm to others?


 [Dr. Stone]: One of the reasons he was brought here in the
MHMR appointment on the day he was admitted
here he was meeting with Doctor Pugh and Doctor
Pugh, he was very threatening to the point Doctor
Pugh felt he needed to be admitted here
immediately.

 . . . .


 [The State]: Because of his delusions is the delusion such he
could harm others?


 [Dr. Stone]: Yes. He has a very firm belie[f] that there are these
women he needs to track down and impregnate. 
That he feels very strongly about this. This is either
a mission he needs to be on or in some ways
compelled to do this. But there are women he needs
to track down and impregnate them. I am concerned
in his delusional state, because he is very delusional,
that he will act on this. He has been out of the State
hospital for a relatively brief period of time and my
concern is with these delusions active still that he is
very likely to act on them. I am very concerned if he
were to find a female that he believed was promised
him that he would then try to impregnate her.


 Dr. Stone also testified to K.E.W.'s inability to function independently:

 [K.E.W.]: You said he was not capable of functioning
independently and you didn't give details why it was
you said that.


 [Dr. Stone]: It's because I believe that he, first of all, does not
believe he has a mental illness does not understand
he has a mental illness; that he is very set on
continuing to work on what he feels are the needs to
find these people and have his flock of women and
impregnate them. He is very concerned with his
delusions. I don't think he can function outside a
hospital setting at this time.


Dr. Stone also testified to his belief that women in general in the society would be at
risk if K.E.W. were not treated. He testified,

 In fact on the unit we're very careful when female medical staff go to
talk to him to keep the door open. Not because he is homicidal, but in
his confused belief he could believe a woman is there and someone
promised to him that does want to be impregnated.


 In addition, Dr. Waleska Ortiz, another of K.E.W.'s treating psychiatrists,
testified that he had seen K.E.W. daily during the week preceding the hearing. When
asked to testify what he had seen in general, he replied:

 [Dr. Ortiz]: With him in general there was the particular concern
regarding the women, and I wanted to know more
about his particular beliefs regarding that. And what
I noticed is that he would become very agitated
regarding the belief of the women. For instance,
when he was in the emergency room he
experienced--I say "experienced" because it's
unclear if he heard it or just information that was
provided to him, but he experienced the knowledge
that some of the women that he was seeking were
actually in the emergency room and that he had just
missed them and that certain staff members in the
emergency room had that information about where
their whereabouts were and they were withholding
that information from him and that it was some sort
of conspiracy to keep those women. So he was very
upset because he had just missed them.


 [The State]: How did he act when he was upset?


 [Dr. Ortiz]: I wasn't present in the emergency room but
according to the clinical record he became very
agitated.


 . . . .


 [The State]: His behavior was of agitation?


 [Dr. Ortiz]: Yes.


 [The State]: Did you see the same type of agitation on the unit
when you met with him personally?


 [Dr. Ortiz]: Not to the degree that was described in the medical
record, and I say that because of the emergency
room setting he required PRN medications at that
time. In the times where I personally interacted with
him he became agitated in that his body status was
very tense. He was very intrusive. He invaded my
space on several occasions because it was very
important to him to stress that he needed to leave
from here. And there were also additional times
where he had an experience where he heard or
experienced that I knew where the women were
located. And when I continually denied that, I knew
then he was convinced that I was able to access
these special agents that would have the key that
would take him to the portal where some of the
women were particularly located at.


 [The State]: How did he convey that to you?


 [Dr. Ortiz]: He told me.


 . . . .


 [The State]: You wrote a narrative, you have memorialized as of
April 21 some findings and some recommendations. 
Do you recall writing a narrative?


 [Dr. Ortiz]: Yes.


 [The State]: In that narrative you indicated on the second page,
"The potential dangerousness of this behavior is
concerning to the treatment team." What behavior
did you think was a potential danger?

 

 [Dr. Ortiz]: The two behaviors were, one, the women
themselves. They are actually on his person because
some of the papers I have on the chart were from
papers he himself wanted me to share with the
Court. And so I made copies of that for the record
which has several of the names of the women he is
searching for. One of them is his step-daughter. He
has a picture of her in her person and he showed
them. I saw pictures of the step-daughter when she
was age four or five and I have also seen her as an
adult.


 Those are one of the women that he was searching
for. I don't know--my concern with those specific
women, I don't know if the sexual interaction that
would occur if he were to find them would be
consensual or not. And because he has very
intrusive I don't know he would understand no
means no, given his state of mind at the time.

 

 The other concern that I had was related to his
misperception regardless how he got that
information, whether he heard it from brain waves
or--because he has these special abilities, from what
he tells me. I don't know if he perceives or
misperceives certain information he can get very
angry and agitated.


 The unit is a very organized and safe setting so a lot
of things that could have happened in the external
world haven't happened because of that order. My
concern is if he is in another situation given another
stimulus, perhaps something would happen, and I
wasn't convinced it wouldn't. That's what was
concerning.


 I cannot disregard either such eyewitness testimony or such expert testimony
by appellant's attending psychiatrists as no evidence, or legally insufficient evidence,
of either the likelihood of appellant's causing serious harm to others or appellant's
"distress and the deterioration of [his] ability to function." I think it is clear and
convincing evidence of both, and I do not think section 574.034(d) permits a court
to disregard such evidence. I believe the quoted testimony by Drs. Stone and Ortiz,
appellant's treating psychiatrists, even without the other evidence set out in the
majority opinion, is sufficient to establish a firm conviction that appellant at the time
of his involuntary commitment both committed overt acts and showed a continuing
pattern of behavior that tended to confirm both his likelihood of causing serious harm
to others and his distress and the deterioration of his ability to function. See Tex.
Health & Safety Code Ann. § 574.034(d). 

 In addition, I would point out that section 574.034(f) provides that, if the
proposed patient and his attorney file a waiver of the right to cross-examine
witnesses, certificates of medical examination for mental illness "constitute
competent medical or psychiatric testimony, and the court may make its findings
solely from the certificates." Tex. Health & Safety Code Ann. § 574.034(f)
(emphasis added). Alternatively, if, as here, the proposed patient does not waive the
right to cross-examine witnesses, "[t]he testimony must include competent medical
or psychiatric testimony" and, additionally, "the court may consider the testimony of
a nonphysician mental health professional." Id. (emphasis added). 

 I find it impossible to reconcile the mandate of section 574.034(f) that expert
medical testimony is both necessary and sufficient to sustain an order of involuntary
commitment when there is no live testimony, and necessary when there is, with the
majority's construction of section 574.034(d) and its conclusion that expert testimony
from treating physicians regarding the proposed patient's mental illness is simply
irrelevant or legally insufficient to prove his tendency to harm himself or others or his
inability to function due to mental illness.

 In addition, I note that in G.H. v. State, a case upon which the majority relies
in this case, this Court acknowledged a split in the courts of appeals on the
interpretation of the "clear and convincing" standard of proof in section 574.034. 
G.H. v. State, 96 S.W.3d 629, 635 (Tex. App.--Houston [1st Dist.] 2002, no pet.). 
The panel in that case refused to follow our sister court even with respect to the same
patient, stating:

 In reaching our holding, we note the recent decision from our sister
court affirming a prior temporary commitment order concerning
appellant. See In re G.H., 94 S.W.3d 115 (Tex. App.--Houston [14th
Dist.] 2002, no pet.). In its majority opinion, the court of appeals
concluded, based on testimony concerning appellant's delusional
behavior and her refusal to take prescribed medications, that the
evidence was legally and factually sufficient to support the trial court's
decision to temporarily commit appellant. Id. at 116-17. Because the
majority opinion in that case does not follow the reasoning of K.T. or of
the cases cited therein, which hold that mere evidence of a patient's
mental illness and refusal to take medication is not sufficient to sustain
the State's statutory burden, we disagree with the analysis applied by the
majority opinion of that court. See K.T., 68 S.W.3d at 892.

Id.

 I have been unable to find a single recent case from this Court affirming an
involuntary commitment order. Thus, I infer that the standard of review established
by this Court for involuntary commitment of a mental patient is not only contrary to
the plain language of the statute, out of harmony with its other provisions and
purpose, and in conflict with our sister court's construction of the same standard, but
so high that no commitment order can survive a legal or factual sufficiency of the
evidence challenge made in this Court. If so, the Court's criterion for "clear and
convincing" evidence of behavior satisfying the requirements of the statute vitiates
the statute. I also note that the fact that a sister court has reached an opposite
conclusion with respect to the same patient under the same statute indicates that
commitment under the statute has become arbitrary--a matter of which appellate
court receives the case and what evidence of mental illness it will recognize as
tending to confirm that a prospective patient presents a likelihood of harm to himself
or others or exhibits distress and the deterioration of his ability to function.

 I would hold that, under a plain language reading of section 574.034, evidence
of appellant's overt acts leading to his hospitalization, testified to by two members
of the staff of the Center, and of his ongoing pattern of threatening and distressed and
dysfunctional psychotic behavior, on which the expert opinions of Drs. Stone and
Ortiz were based, plainly satisfies the "clear and convincing" standard of review of
evidence tending to establish the likelihood of serious harm being caused by the
proposed patient or the proposed patient's distress and the deterioration of his ability
to function. See K.T., 68 S.W.3d at 890 ("The clear and convincing standard is the
degree of proof that will produce in the mind of the trier of fact 'a firm belief or
conviction' as to the truth of the allegations sought to be proved."). 








Conclusion

 I would affirm the judgment of the trial court ordering temporary inpatient
mental health services and the order to administer psychoactive medications.





 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Alcala.


Justice Keyes, dissenting.
1. See Tex. Health & Safety Code Ann. § 574.034 (Vernon 2003).