NO. 07-00-0530-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

APRIL 16, 2002

_____

THE STATE OF TEXAS FOR THE BEST INTEREST
AND PROTECTION OF K.D.C., AS A MENTALLY ILL PERSON
_____

FROM THE COUNTY COURT OF LUBBOCK COUNTY;

NO. 2000-789,652; HONORABLE TOM HEAD, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

Appellant K.D.C. appeals from orders committing her for temporary inpatient mental health services and authorizing administration of psychoactive medication. We reverse and render as to both orders.

BACKGROUND

On November 1, 2000, K.D.C. was detained in Levelland, Hockley County, and taken to the Sunrise Canyon Hospital (the hospital) in Lubbock. An Order for Protective Custody was issued by the Lubbock County judge (the "trial judge" or "trial court") pursuant to an Application for Emergency Detention and Temporary Mental Health Services. The

application alleged that K.D.C. was mentally ill and evidenced a substantial risk of harm to herself or others in that she was exhibiting manic behavior and hyper-religiosity, and was unable to care for herself. The order for protective custody was to expire on November 6, 2000. Pursuant to agreement of K.D.C.'s attorney *ad litem*, the order was extended until November 9, 2000.

On November 9, 2000, the trial court held a hearing to determine whether K.D.C. should be detained for court-ordered temporary inpatient mental health services for up to 90 days. See TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon Supp. 2002).[1] The trial court granted the State's motion. The court's order included findings that K.D.C. was mentally ill and that each of the subdivisions of HSC § 574.034(a)(2) were applicable. The court adjudged appellant mentally ill, determined that she required inpatient care and treatment in a mental health facility and ordered that she be committed for inpatient mental health services for a period not exceeding 90 days. See HSC § 574.034(g). After finding that K.D.C. required inpatient care and treatment and ordering that she be committed for such treatment, the court held a hearing on and granted the State's application to administer psychoactive medications to K.D.C.

K.D.C. does not challenge the determination that she was mentally ill. See HSC § 574.034(a)(1). However, she challenges the evidentiary support for findings required

---

[1]Further references to provisions of the Health and Safety Code will be by reference to "HSC § _."

2

pursuant to HSC § 574.034(a)(2). She also challenges the order authorizing administration of psychoactive medications.

K.D.C. asserts five issues, but groups the first four together for argument. By her first issue, K.D.C. argues that the evidence was insufficient to prove that she would likely cause harm to herself or others. See HSC § 574.034(a)(2)(A) and (B). Her second issue alleges that the evidence was insufficient to prove that she was suffering severe distress, see HSC § 574.034(a)(2)(C)(i), or deterioration of her ability to function independently. See HSC § 574.034(a)(2)(C)(ii). In her third issue, K.D.C. asserts that the evidence was insufficient to prove that she was not capable of surviving safely in freedom. By her fourth issue, K.D.C. generally contends that the evidence was insufficient to prove that the requirements of HSC § 574.034 were met as to her. Her fifth issue urges that the order authorizing administration of psychoactive medications is invalid because it must be based on a valid order that she be committed for inpatient care, and the order for inpatient care was not valid for the reasons urged in her first four issues. See HSC § 574.104(a)(3), (b)(3). Although K.D.C. does not clearly set out whether she is challenging the legal or factual sufficiency of the evidence, we construe the issues to be both legal and factual sufficiency challenges. See TEX. R. APP. P. 38.1(e).

## STANDARD OF REVIEW

In instances requiring the trial court to exercise its function as a factfinder and to also make legal determinations and to exercise its discretion in making a decision based

3

on combination of the two functions, appellate review is multi-faceted.  See Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998).  Necessary underlying factual findings by the trial court are reviewable for legal and factual sufficiency of the evidence.  Id.  Decisions vested in the discretion of the trial court based on predicate factual findings supported by the evidence, decisions involving application of legal principles, or decisions involving application of or matters of law are reviewed only to determine whether the trial court acted without reference to any guiding rules and principles.  See Craddock v. Sunshine Bus Lines, Inc., 134 Tex. 388, 393, 133 S.W.2d 124, 126 (1939).

An appellate court reviewing "no evidence" or legal sufficiency complaints may consider only the evidence and inferences that tend to support the finding and must disregard all contrary evidence and inferences.  See Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996).  In the absence of direct evidence, a finding may be upheld on circumstantial evidence if the finding may be fairly and reasonably inferred from the facts.  See Blount v. Bordens, Inc., 910 S.W.2d 931, 933 (Tex. 1995).

If a finding is challenged for factual sufficiency of the evidence, all of the evidence is reviewed.  See Lofton v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986).  The review includes evidence both favorable to and contrary to the findings.  See In re King's Estate, 150 Tex. 662, 664-65, 244 S.W.2d 660, 661 (1951).  We reverse on the basis of factual insufficiency only if the verdict is so against the great weight and preponderance of the evidence that it is manifestly erroneous or unjust.  Id.  Where enough evidence is before the factfinder that reasonable minds could differ on the meaning of the evidence or

4

the inferences and conclusions to be drawn from the evidence, we may not substitute our judgment for that of the factfinder. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988).

LAW

A judge may order a proposed patient to receive court-ordered, temporary inpatient mental health services only if the judge finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

    (A) is likely to cause serious harm to himself;

    (B) is likely to cause serious harm to others; or

    (C) is:

> (i) suffering severe and abnormal mental, emotional, or physical distress;
>
> (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
>
> (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

HSC § 574.034(a).

5

Clear and convincing evidence is that measure or degree of evidence that will produce in the mind of the trier of fact a firm belief or conviction about the truth of the allegations sought to be established. In re Breeden, 4 S.W.3d 782, 784 (Tex.App.--San Antonio 1999, no pet.). In order to meet the clear and convincing standard required by HSC § 574.034(a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

> (1) the likelihood of serious harm to the proposed patient or others; or
>
> (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

HSC § 574.034(d).

An expert opinion recommending involuntary commitment must be supported by a showing of the factual basis on which it is grounded. See In re Breeden, 4 S.W.3d at 784; Goldwait v. State, 961 S.W.2d 432, 434 (Tex.App.--Houston [1st Dist.] 1997, no writ). A threat of harm to the patient or others must be substantial and based on actual dangerous behavior manifested by some overt act or threats in the recent past. See Taylor v. State, 671 S.W.2d 535, 538 (Tex.App.--Houston [1st Dist.] 1983, no writ). Evidence that an individual is mentally ill and in need of hospitalization is not evidence that the statutory standard for involuntary commitment has been met. See Broussard v. State, 827 S.W.2d 619, 622 (Tex.App.--Corpus Christi 1992, no writ); State for Interest of P.W., 801 S.W.2d 1, 3 (Tex.App.--Fort Worth 1990, writ denied). Psychotic behavior alone is insufficient to

6

justify commitment on grounds of mental distress and deterioration of the ability to function independently. See Broussard, 827 S.W.2d at 622; T.G. v. State, 7 S.W.3d 248, 252 (Tex.App.--Dallas 1999, no pet.). Moreover, such behavior is not evidence of a "continuing pattern of behavior that tends to confirm the likelihood of serious harm to [the proposed patient] or others." Id.

ANALYSIS

As we have previously noted, K.D.C. does not challenge the trial court's finding that she was mentally ill. She challenges, in effect, the proof and findings of a recent overt act or a continuing pattern of behavior on her part as required by HSC § 574.034(d).

The State presented testimony from three witnesses: Margaret Lair, director of social services at Sunrise Canyon Hospital; Harold Veits, M.D., a psychiatrist; and K.D.C. K.D.C. called her husband, W.T.C., as a witness.

Lair was assigned as K.D.C.'s social worker in the hospital and had worked with K.D.C. every day that K.D.C. had been in the hospital, except for one Saturday. Lair testified to the history given by K.D.C. According to that history, at the time K.D.C. was

detained in Levelland, she and W.T.C. were on their way to Whiteface, Texas. K.D.C. had lived at Girlstown in Whiteface and had attended high school there. She wanted to try to find out about her past, and her husband was going to try to find a job there. Additionally, K.D.C. was going to try to find Post Office Box 179, which was a drug and alcohol treatment center, to try to find out what God wanted her to do. K.D.C. and W.T.C. had walked from Midland to Levelland on their way to Whiteface. K.D.C. related that she had been diagnosed with bipolar disorder and that she had been hospitalized in Victoria, Texas, for about three days in October, 2000.

According to Lair, K.D.C. was exhibiting rapid, pressured speech and religious ideations when first admitted to the hospital. For example, according to Lair, K.D.C. believed she was experiencing a "miraculous birth" because K.D.C. reported a recent positive pregnancy test despite having had a previous hysterectomy. Lair testified that the hospital also administered a pregnancy test to K.D.C. and that it was positive. Lair termed the hospital's test result as a "false" positive, however, because the hospital later performed a blood test on K.D.C., and the results indicated that K.D.C. was not pregnant. Lair further testified that despite the results from the blood test, K.D.C. refused medication at first because she continued to believe that she was pregnant.[2] According to Lair, K.D.C. agreed to accept Haldol after she was convinced that it would be the least dangerous

---

[2]Lair noted that hospital personnel at first were concerned that K.D.C. might be pregnant and did not want to give her any medications until they were sure that she was not pregnant, which was after the blood test.

medication for her if indeed she were pregnant. K.D.C. also agreed to take Depacote, a mood stabilizing medication.

Lair's opinion was that K.D.C. had shown remarkable improvement ("about 80 percent") during her hospitalization. When asked by the State's attorney if, despite her improvements, K.D.C. "is still suffering a deterioration of her ability to function" Lair responded that K.D.C. had made remarkable improvement and recognized her need for medication, but that the hospital personnel questioned K.D.C.'s support system outside the hospital, and that Lair had "concern" that "we" do not know K.D.C. well enough to know whether she would continue to take her medications and that if she did not, she would become psychotic again. Lair was also "concerned" about K.D.C.'s mood level and that her medication dosage might need to be changed.

On cross-examination, Lair reported that the hospital had no history of K.D.C. failing or refusing to take medication when it was prescribed for her. She also reiterated her prior testimony that K.D.C. told Lair and Dr. Veits that she knew she needed to be on medication. Lair opined that appellant was not a danger to others.

Dr. Harold Veits attended and examined appellant during her hospitalization. Dr. Veits testified as an expert in support of the application, and his qualifications are not in dispute. Dr. Veits evaluated appellant and diagnosed her as suffering from bipolar disorder, manic phase, which is considered a mental illness. He concurred in Lair's opinion that appellant was not likely to cause serious harm to others. Nevertheless, he

9

opined that (1) K.D.C. posed a threat of serious harm to herself in the sense that she would be unable to function in the community due to her lack of organization and inability to conduct her daily affairs; (2) appellant was suffering severe and abnormal mental, emotional or physical distress because she was being held in a hospital, and not being allowed to pursue her interests and concerns; (3) as a result of appellant's mental illness, she was experiencing substantial mental or physical deterioration of her ability to function as exhibited by appellant's inability to provide for her own needs, although he had seen no indication that appellant was malnourished or starving, and that at least since she had been in the hospital she had been taking care of her hygiene in a normal manner; (4) as a result of her mental illness, appellant was unable to make a rational and informed decision as to whether or not she should submit to treatment; (5) a continuing pattern of behavior tended to confirm appellant's distress and deterioration of her ability to function, in that appellant had been recently hospitalized in Victoria, although he clarified on cross-examination that K.D.C.'s condition had begun improving over "the last day or two"; (6) he did not believe that appellant could successfully be treated on an outpatient basis. Dr. Veits assumed that much of the recent improvement in appellant was due to the Haldol she agreed to take, and since the hospital had only recently changed appellant's medication, he believed that appellant would stop taking medication if she were to leave the hospital immediately.

The State next called K.D.C. to testify. K.D.C. did not know whether she was pregnant or not. She had been told both that she was and that she was not, although she

knew that she previously had a hysterectomy. She recognized that she needed help for her emotional problems, and that medication was part of the help that she needed. She knew the dates that she had been hospitalized in Victoria, Texas, that she had been on Haldol while she was hospitalized there, and that she was discharged without any medications prescribed. Haldol made her sleepy when she took it in Victoria and also when she took it at the hospital. She and her husband planned to return to Victoria to live with her "adopted" father when she was released from the hospital. She was crying at times during the hearing because she was scared by the legal process in which she was involved, which included an appointed lawyer she had never met before and being in a courtroom in Lubbock where she had never been before. She was also distressed because she was locked up in a hospital and wanted to go home and "people won't let me." She recognized that she was going to need medicine for a while and was willing to take what Dr. Veits prescribed until she saw another psychiatrist.

After the State rested, K.D.C. called her husband, W.T.C., as a witness. W.T.C. agreed that K.D.C. was very religious, as was he. He had known K.D.C. for 15 years and she had never hurt herself or anyone else. When she was not with W.T.C., she stayed pretty much to herself. She received psychological help in Victoria, from a doctor in Midland, and while she had been in Lubbock. She had at one time been employed by Skillet's Restaurant as a waitress, but had been fired. W.T.C. visited K.D.C. in the hospital in Lubbock on a daily basis. He was not employed at the time of the hearing, but had been

11

in the past and planned on returning to work when he and K.D.C. returned to Victoria. He confirmed that they had a place to stay with K.D.C.'s "adopted" father in Victoria.

The legislature has specified that proof of mental illness is insufficient reason for a person to be involuntarily confined for inpatient mental health services. See HSC § 574.034(a), (d). To justify involuntary confinement, clear and convincing evidence must be offered of (1) a recent overt act or pattern of behavior on the part of the proposed patient that tends to confirm the proposed patient is likely to seriously harm herself or others; or (2) the proposed patient's distress and deterioration of the proposed patient's ability to function. See id.

We first consider K.D.C.'s legal sufficiency challenge to the evidence. In doing so, we view the evidence and inferences from the evidence in the light most favorable to the trial court's findings and disregard all contrary evidence and inferences. See Cazarez, 937 S.W.2d at 450. In reviewing the evidence according to such standard, we note that the record contains meager evidence of *any* overt acts by K.D.C. Evidence was presented that she stayed in a hospital in Victoria until she was discharged. The specific reason for her hospitalization was not proved, although testimony supports the inference that it was for mental problems. Following her release from the Victoria hospital, K.D.C. and her husband left Victoria and somehow arrived in Midland. In Midland she was treated by a doctor in some manner for her mental difficulties. She and her husband were walking from Midland to Whiteface when deputies in Levelland picked her up and transported her to the hospital in Lubbock. The only evidence introduced at the hearing as to what prompted the

12

deputies to pick her up was K.D.C.'s testimony that the deputies thought she was on street drugs. The factual basis for such alleged belief by the deputies was not proved. K.D.C. denied having used street drugs; she did not like them.

The only evidence as to K.D.C.'s condition when she was admitted to the hospital was given by Lair: K.D.C. was exhibiting rapid, pressured speech and religious ideations. The religious ideations continued during her hospital stay as evidenced by Lair's descriptions of K.D.C.'s statements and biblical references in her conversations.

Dr. Veits testified to his conclusions that appellant was in a deteriorating condition prior to the last few days before the hearing. The basis for his conclusion was her stay in the Victoria hospital, although he did not testify to the reasons, if he knew, for her hospitalization and no one disputed K.D.C.'s testimony that she had been discharged from Victoria without medications or prescriptions, and on her "own recognizance." Dr. Veits also was of the opinion that K.D.C. was a danger to herself because she was disorganized and would be unable to function outside the hospital setting. However, he did not testify to any specific overt act or pattern of behavior supporting his conclusion that K.D.C. was disorganized and that the disorganization was so disruptive that it would render her unable to function outside the hospital. Such foundation for his opinion is required. See In re Breeden, 4 S.W.3d at 784; Goldwait, 961 S.W.2d at 434.[3] Although Lair and Dr. Veits expressed subjective fears about K.D.C.'s ability to maintain a medication regimen and

---

[3]For a discussion of appellate no evidence and legal insufficiency evidence review of expert and expert opinion evidence, see Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 712, 714 (Tex. 1997).

13

care for herself outside the hospital, both Lair and Dr. Veits considered that K.D.C.'s mental condition had recently improved as of the time of the hearing and neither testified to recent specific, overt actions or pattern of behavior by K.D.C. to support their opinions as to how she would conduct herself if not committed for inpatient services. The only pattern of behavior testified to was Dr. Veits' reference to K.D.C.'s prior hospitalization in Victoria. But, the bare fact of K.D.C.'s hospitalization in Victoria, without more, such as a factual history giving the basis for the hospitalization, diagnoses made during the hospitalization, treatment given K.D.C. during the hospitalization, and discharge instructions and restrictions placed on K.D.C., if any, does not suffice to prove a recent "pattern of behavior" in conjunction with her hospitalization in Lubbock when the only evidence of the reason deputies brought her to the Lubbock hospital was K.D.C.'s statement that they thought she was on street drugs, without relating any underlying facts. And, although Lair's opinions might well have been valid, the legislature has mandated that more than conclusory opinions by experts is required before a person may be involuntarily committed for inpatient mental health services.

K.D.C. recognized that she needed help and that medication was part of that help. No evidence contradicted the factual testimony of K.D.C. and her husband that they lived and worked in Victoria, were then in Midland and walked to Levelland. No evidence was presented of overt acts or pattern of behavior on the part of K.D.C. such as evidence that either at or before the time she was brought to the hospital or at the time of the hearing she had been physically abused or injured by others, had physically abused or injured

14

herself, was malnourished, refused to eat or sleep, was unable or unwilling to practice proper hygiene, or had either discontinued using medications prescribed for her previously or refused medications in the hospital except out of concern that she might be pregnant and did not want to take any medicine which might be detrimental if she were pregnant. Proof of K.D.C.'s mental illness, which she admitted, religious ideations or psychotic behavior, without more, does not fulfill the statutory requirement for ordering involuntary inpatient mental health services under HSC § 574.034(a). See T.G., 7 S.W.3d at 252; Broussard, 827 S.W.2d at 622; State for Interest of P.W., 801 S.W.2d at 3.

We conclude that the State offered legally insufficient evidence to prove an overt act or continuing pattern of behavior by K.D.C. that tended to confirm (1) the likelihood of serious harm to K.D.C. or others; or (2) deterioration of K.D.C.'s ability to function. See HSC § 574.034(d); Cazarez, 937 S.W.2d at 450. Accordingly, the evidence is legally insufficient to support the factual findings required by HSC §§ 574.034(a)(2)(A), (B), or (C)(ii). Without such evidence, the trial court's order was not authorized by statute, and was an abuse of discretion. See Bocquet, 972 S.W.2d at 21. Moreover, even if the record evidence is legally sufficient to sustain either such finding, we conclude from the entire record, as analyzed above, that a finding of such an overt act or continuing pattern of behavior is manifestly unjust and based on factually insufficient evidence. See Lofton, 720 S.W.2d at 805.

We sustain K.D.C.'s first and second issues for legal insufficiency of the evidence. Sustaining such issues requires that we reverse the trial court order authorizing inpatient

15

mental health services. Generally, if an appellate court sustains a "no evidence" or "legal insufficiency" issue, the appellate court must reverse and render judgment. See Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex. 1986). Thus, we also will render judgment in favor of K.D.C. Because our disposition of her first two issues is determinative of the appeal as to the trial court's order authorizing inpatient health services, we need not address K.D.C.'s third and fourth issues. See TEX. R. APP. P. 47.1.

An order authorizing the administration of psychoactive medication may be entered only if the patient is under a valid order for temporary or extended mental health services pursuant to HSC § 574.034 or § 574.035. See HSC § 574.106(a)(1). In the absence of a valid order for temporary or extended mental health services, the order authorizing the administration of psychoactive medication is not authorized by statute. Thus, having sustained K.D.C.'s first two issues and having reversed the order authorizing inpatient mental health services, we also sustain K.D.C.'s fifth issue and reverse the trial court's order authorizing administration of psychoactive medication. See id.

CONCLUSION

We sustain K.D.C.'s issues one, two and five. We do not consider her third or fourth issues. We reverse the order of the trial court authorizing temporary inpatient mental health services and render an order that the State's application for court-ordered temporary inpatient mental health services is denied. We reverse the order of the trial court authorizing administration of psychoactive medications and render an order that the

16

State's application for order to authorize administration of psychoactive medications is denied.  <u>See</u> Tᴇx. R. Aᴘᴘ. P. 43.2(c).


                                                              Phil Johnson
                                                                 Justice


Publish.