In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00124-CR


______________________________




ALLEN RAY SHIPP, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 336th Judicial District Court


Fannin County, Texas


Trial Court No. 22670




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 According to Allen Ray Shipp's version of events, he accompanied his wife, Carol, to the
Wal-Mart store in Bonham. While there, Carol turned over the shopping cart to him which
contained a computer and computer desk, along with what she represented was a receipt for the
items. Carol told him that the items had already been checked out and paid for and that he needed
to take them to the car. As he exited the store, he was stopped by a Wal-Mart employee, who asked
to see a receipt for the items in the shopping cart; the receipt he exhibited to the store employee was
not a true receipt at all, but a forgery. Shipp was convicted by a jury of forgery of a commercial
instrument. (1) Because we do not find the forged receipt in this situation to fall within the definition
of a "commercial instrument," we reverse Shipp's conviction for this charge.

 We refer the reader to our opinion in cause number 06-08-00122-CR for a detailed recitation
of the facts in this case. 

 The evidence relative to this charge is not difficult to follow. Carol testified that it had been
solely her idea to falsify the Wal-Mart receipt. She maintained that without Shipp's knowledge, she
had used his computer and scanner to create the false receipt. Carol told the jury that she had told
Shipp that she had already paid for the computer, and "all he had to do was leave with it. He didn't
know no different" (i.e., that he was unaware that she had not in fact paid for the computer and desk
and that the receipt was phony). 

 It is worth noting that there were two other receipts (characterized by Carol as being
"practice" receipts) introduced into evidence as well as the receipt which Shipp had presented. These
two practice receipts were found in the automobile which Shipp had driven to the Wal-Mart store. 
The State pointed out that these receipts were located above the sun visor on the driver's side of the
automobile. The inference which the jury was to draw was that the location of the receipts indicated
that they were under the control of Shipp or that he had knowledge of their existence (and, hence,
was aware that the "receipt" which he had was a forgery). 

Indictment, Offense 

 Shipp was originally indicted under Section 32.21(d) of the Texas Penal Code, which
particularizes the offense of forgery as follows:

 An offense under this section is a state jail felony if the writing is or purports to be
a will, codicil, deed, deed of trust, mortgage, security instrument, security agreement,
credit card, check, authorization to debit an account at a financial institution, or
similar sight order for payment of money, contract, release, or other commercial
instrument.


Tex. Penal Code Ann. § 32.21 (Vernon Supp. 2008). The indictment accused Shipp of passing
a "writing," to-wit: "a store receipt that purported to be a valid receipt issued by the Wal-Mart store
in Bonham, Texas, to indicate the sale of merchandise." On the morning of trial, the State moved
to amend the indictment to change "writing" to "commercial instrument." No objection was lodged
by Shipp to this proposed amendment; the trial court granted the State's motion and the indictment
was interlined such that "writing" was interlined and the phrase "commercial instrument" was written
above it. The trial court's charge, as read to the jury, stated that "'Commercial instrument' means
anything reduced to writing which is executed or delivered as evidence of an act or agreement, and
said writing relates to or is connected with trade, and traffic, or commerce in general, or is occupied
with business and commerce." As a point of interest, the indictment's heading, which listed the
offense, states, "OFFENSE: FORGERY FINANCIAL INSTRUMENT- ENHANCED." (Emphasis
added.) The trial court's judgment also states the offense of which Shipp was convicted was forgery
of a financial instrument--not a commercial instrument. Shipp himself, in his appellate brief,
sometimes complains of his conviction for forgery of a "financial instrument," but raises no objection
to the discrepancy. The term "financial instrument" does not appear in Section 32.21 of the Texas
Penal Code.

 As part of his attack on the legal sufficiency of the evidence, Shipp asserts, as he did before
the trial court, that the Wal-Mart receipt in this case does not qualify as a "commercial instrument"
as that term is used in Section 32.21. 

Standard of Review

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006);
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).

 In this analysis, we may use a hypothetically-correct jury charge to evaluate both the legal
and factual sufficiency of evidence. Grotti v. State, 273 S.W.3d 273 (Tex. Crim. App. 2008). A
hypothetically-correct jury charge is one "that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the
State's theories of liability, and adequately describes the particular offense for which the defendant
was tried." Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

 In looking at the requirements of Section 32.21 of the Texas Penal Code, we see that the
proof required under these circumstances would be that Shipp had a writing in his possession which
purported to be an "original when no such original existed" and that he intended to pass or utter it
with the intent to defraud another. The offense is elevated from a class A misdemeanor to a state-jail
felony if the writing falls within those listed; in this case, the State maintains that the writing
possessed by Shipp fell within the classification of "other commercial instrument." 

 Shipp challenges only two elements of the proof here in that he claims that there is factual
insufficiency to reveal his intent to defraud and that there is legal insufficiency in the proof that the
receipt was a commercial instrument. 

Intent to Defraud?

 The evidence recited here certainly shows that Shipp was attempting to exit the Wal-Mart
store with the computer and desk and displayed the receipt to demonstrate that those items had
already been paid for. On the one hand, there is testimony about Shipp's nervousness and his general
demeanor; on the other hand, there is the testimony of his wife, maintaining that the entire scheme
had been her product and that Shipp was an innocent dupe in that scheme. The jury had the
opportunity to observe the testimony and weigh the credibility of the witnesses. The Texas Court
of Criminal Appeals has recently reiterated the role that the appellate courts play in reviewing the
factual sufficiency of the evidence:

 Although a factual sufficiency review authorizes an appellate court, to a very limited
degree, to act as a "thirteenth juror," the appellate court must nevertheless give the
jury's verdict a great degree of deference. A "high level of skepticism about the jury's
verdict" is required before an appellate court may reverse due to factual
insufficiency.["] An appellate court may not find the evidence to be factually
insufficient merely because there are "reasonably equal competing theories of
causation." And a factual sufficiency reversal certainly may not occur when the
evidence actually preponderates in favor of conviction. 

 

Steadman v. State, 280 S.W.3d 242, 246-47 (Tex. Crim. App. 2009) (footnotes omitted). In this
case, we do not entertain the high level of skepticism about the jury's verdict which would be
necessary before we can say that there is a factual insufficiency here. We determine that the
evidence presented here was factually sufficient to sustain the jury's finding.

Is a Receipt a Commercial Instrument? 

 As part of his attack on the legal sufficiency of the evidence, Shipp asserts that the receipt
at issue in this case does not qualify as a commercial instrument, as that term is used in the above
statute. (2) 

 As noted above, the trial court provided an instruction in the jury charge which set out a
definition of "commercial instrument" as follows: "'Commercial instrument' means anything reduced
to writing which is executed or delivered as evidence of an act or agreement, and said writing relates
to or is connected with trade, and traffic, or commerce in general, or is occupied with business and
commerce." This definition was included in the charge with no objection from Shipp. However,
Shipp's appellate brief (without mentioning the above definition) posits that the term "commercial
instrument" means something entirely different from that contained within the instructions contained
in the charge. Although the brief does not identify it in so many words, we conclude this to be a
challenge to the jury charge. 

 When construing statutory provisions, courts should generally give effect to their plain
meaning. Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). By construing provisions
according to their plain meaning, courts properly effectuate the collective legislative intent behind
the enactment. Id. Thus, since the best evidence of the collective legislative intent is the statutory
text, rules of statutory construction are utilized to ascertain the meaning of that text. Id. These
canons of construction, however, are merely rules of logic used to assist in the interpretation of
statutory provisions. Id. at 785 n.3. The duty of the appellate court is to construe this provision
according to its "plain" textual meaning without resort to extratextual sources. See id. at 785;
Rosenblatt v. City of Houston, 31 S.W.3d 399, 403 (Tex. App.--Corpus Christi 2000, pet. denied)
(statutory rules of construction also apply to construing city ordinances). We will, however, also
resort to extratextual sources to construe this provision if we decide that it is ambiguous or that
construing it according to its "plain" textual meaning will lead to "absurd results." Jordan v. State,
36 S.W.3d 871, 873 (Tex. Crim. App. 2001). The cardinal rule is to discern and give effect to the
intent of the legislative body that enacted this provision. See Boykin, 818 S.W.2d at 785-86;
Rosenblatt, 31 S.W.3d at 403. "In absence of special definitions, statutory language can be measured
by common understanding and practices or construed in the sense generally understood." Carroll
v. State, 911 S.W.2d 210, 220 (Tex. App.--Austin 1995, no pet.) (citing Ely v. State, 582 S.W.2d
416, 419 (Tex. Crim. App. [Panel Op.] 1979)). Statutory words are to be read in context and
construed according to the rules of grammar and common usage. Tex. Gov't Code Ann. §
311.011(a) (Vernon 2005). The phrase "commercial instrument" is not defined in Black's Law
Dictionary or any Texas Code. Shipp's complaint and our research and analysis concerning it also
lead us to conclude that the term "commercial instrument" is not a phrase in common use;
accordingly, without a statutory definition of the term and the absence of a common use definition,
we find it difficult to absolutely define. 

 There appear to be two recent, unpublished, Texas cases addressing forgery convictions
where a commercial instrument was the alleged forged writing.

 In Graham v. State, No. 14-97-00840-CR, 1999 WL 298274 (Tex. App.--Houston [14th
Dist.] Apr. 13, 1999, pet. denied) (not designated for publication), Graham was convicted of forgery
of a commercial instrument. A merchandise credit slip from an Ann Taylor clothing store worth
$43.39 had been left in a day planner in a courtesy van driven by Graham. Graham admitted taking
the day planner and, after removing the credit slip, discarding the day planner. She then used the
credit slip at the Ann Taylor store to purchase jeans. There was testimony that the credit slip was
akin to a gift card, and the way an individual uses the slip is substantially similar to a gift card (i.e.,
the credit slip could be used in the same way as one would use cash or a check, to acquire
merchandise). According to a store manager, a merchandise credit for a specific amount can be
redeemed at any Ann Taylor store for merchandise in the same fashion as if it were money, a check,
or a credit for the specified amount on the merchandise credit slip. The appellate court found the
evidence sufficient to support a finding that the credit slip qualified as a commercial instrument. Id.
at *18. We recognize that the trial court in that case cobbled together a definition of commercial
instrument, which might have fit the circumstances of that case (a definition which appears to have
been largely used as instructions in the charge employed in the case under review here). While we
do not say that the definition used in Graham was not appropriate under the circumstances of that
case, we question whether it is not so broad as to disqualify it for universal use. 

 In Runnels v. State, No. 14-03-00657-CR, 2005 Tex. App. LEXIS 1381 (Tex.
App.--Houston [14th Dist.] Feb. 15, 2005, pet. ref'd) (mem. op.) (not designated for publication),
the court of appeals sustained a conviction of forgery pursuant to Section 32.21(d) when the
defendant sold counterfeit football tickets. Runnels attacked the trial court's jurisdiction, claiming
that the indictment did not state that Runnels had forged a commercial instrument; ergo, Runnels
reasoned, the indictment only charged a misdemeanor, and the district court's jurisdiction was not
properly invoked. See Tex. Penal Code Ann. § 32.21. The indictment charged that Runnels had
forged a document that had been duplicated and attached as an exhibit. While observing that the
statute does not define "commercial instrument" but with no other analysis of what elements are
necessarily contained within a document to constitute it as such a thing, the appellate court
determined that the indictment did, indeed, allege a state-jail felony. The inference which can be
drawn is that the appellate court concluded that tickets to an event qualified as a commercial
instrument. 

 We find little guidance in either of the opinions mentioned above to aid us in determining
what constitutes a commercial instrument. The credit slip mentioned in Graham is substantially
different from the receipt in this case. In Graham, the credit slip was "as good as money" (i.e., it
could be spent by the bearer to apply to the purchase of anything in that store). In Runnels, the
football tickets, such as they were, at least purported to offer a value to the holder because (if real)
they permitted the bearer to gain admittance to the stadium and be entitled to sit in a designated seat. 
Here, an authentic receipt would serve only as evidence of a transaction which had already been
concluded and not something which promised future benefits. Once the transaction was concluded,
the receipt held no further future value. There was no evidence presented at trial that such a receipt
would be valuable for future use (i.e., it could be redeemed for money) if it was returned with the
merchandise supposedly purchased for an exchange. (3) 

Ejusdem Generis

 Without an explicit statutory definition of the term "commercial instrument" or any
persuasive or controlling caselaw addressing this issue, we turn to one of the traditional doctrines
of statutory construction, the doctrine of ejusdem generis: when words of a general nature are used
in connection with the designation of particular objects or classes of persons or things, the meaning
of the general words will be restricted to the particular designation. Hilco Elec. Co-op, Inc. v.
Midlothian Butane Gas Co., 111 S.W.3d 75, 81 (Tex. 2003) (citing Carr v. Rogers, 383 S.W.2d 383,
387 (Tex. 1964)); see also Hall St. Assocs., L.L.C. v. Mattel, Inc., __ U.S. __, 128 S. Ct. 1396, 1404,
170 L.Ed.2d 254, 264 (2008) ("[T]he old rule of ejusdem generis has an implicit lesson to teach here. 
Under that rule, when a statute sets out a series of specific items ending with a general term, that
general term is confined to covering subjects comparable to the specifics it follows."). (4)

 In applying the doctrine of ejusdem generis, we look at the specific items listed in Section
32.21(d) before the general term "other commercial instrument," those being "will, codicil, deed,
deed of trust, mortgage, security instrument, security agreement, credit card, check, authorization to
debit an account at a financial institution, or similar sight order for payment of money, contract,
release, or other commercial instrument." 

 We make the following observations: 


 A will is a "document by which a person directs his or her estate to be distributed upon
death." Black's Law Dictionary 1628 (8th ed. 2004). 

 A codicil is a "supplement or addition to a will, not necessarily disposing of the entire estate
but modifying, explaining, or otherwise qualifying the will in some way." Id. at 275.

 A deed is "[a] written instrument by which land is conveyed," or "[a]t common law, any
written instrument that is signed, sealed, and delivered and that conveys some interest in
property." Id. at 444.

 A deed of trust is "[a] deed conveying title to real property to a trustee as security until the
grantor repays a loan." Id. at 445.

 A mortgage is "[a] conveyance of title to property that is given as security for the payment
of a debt or the performance of a duty and that will become void upon payment or
performance according to the stipulated terms." Id. at 1031.

 "Security instrument" is not defined in Black's. 

 A security agreement is "[a]n agreement that creates or provides for an interest in specified
real or personal property to guarantee the performance of an obligation." Id. at 1387.

 A credit card is "[a]n identification card used to obtain items on credit, usu. on a revolving
basis." Id. at 396.

 A check is "(i) a draft, other than a documentary draft, payable on demand and drawn on a
bank or (ii) a cashier's check or teller's check." Tex. Bus. & Com. Code Ann.
§ 3-104(f)(i)-(ii); or a "draft signed by the maker or drawer, drawn on a bank, payable on
demand, and unlimited in negotiability." Id. at 252.




 A contract is "[a]n agreement between two or more parties creating obligations that are
enforceable or otherwise recognizable at law." Id. at 341.


 


 A release is a "[l]iberation from an obligation, duty, or demand; the act of giving up a right
or claim to the person against whom it could have been enforced," or "[t]he relinquishment
or concession of a right, title, or claim." Id. at 1315.



 Observing that it could be construed as pedantic in listing the above definitions, this is done
to determine whether the receipt in Shipp's case can be said to fit within the statute's final, general
term, "other commercial instruments." We find that the enumerated examples in Section 32.21(d)
all relate to legal rights or relationships: the right to take or cede possession of property or property
rights or to hold another party to or release another party from contractually stated agreements. 
Checks and credit cards operate in lieu of cash to allow financial transactions. Each of the items
listed in Section 32.21(d) before the catchall "other commercial instruments" either grants or cedes
a valuable right. Therefore, we determine that such "other commercial instruments" are documents
in writing which either grant or cede a present or future benefit or right in the same or similar fashion
as those enumerated in Section 32.21(d).

 In contrast, an ordinary receipt simply memorializes a transaction that has previously
occurred, a fait accompli, which provides no future benefit. A receipt is a "written acknowledgment
that something has been received." Id. at 1296. Although the testimony provided by the State
showed many reasons why the fake receipt was faulty and demonstrated that such receipts can be
cross-checked for veracity a number of ways, there was no testimony provided here to demonstrate
that a receipt issued by this Wal-Mart store is anything more than the memorialization of a past
transaction, as opposed to the other kinds of things granting or ceding future benefits or rights listed
in Section 32.21(d). Although we can conceive of situations in which a receipt might be used by
some in more ways than those contained in the classic definition of the term, there was no evidence
of that adduced in such a regard here. We determine that under the circumstances in this case, the
definition of "commercial instrument" as contained in the jury charge was erroneous. 

 Since, without saying so, this disagreement with the accuracy of the definition of
"commercial instrument" as employed in the jury charge amounts to an alleged jury charge error, we
first determine whether sufficient harm resulted from the error to compel reversal. Ngo v. State, 175
S.W.3d 738, 743-44 (Tex. Crim. App. 2005). When error occurs in failing to properly instruct the
jury, our review of the charge is under the Almanza standard. Almanza v. State, 686 S.W.2d 157,
171 (Tex. Crim. App. 1984) (op. on reh'g). Under Almanza, the standard of review for errors in the
jury charge depends on whether the defendant properly objected. Id.; see Mann v. State, 964 S.W.2d
639, 641 (Tex. Crim. App. 1998); Gornick v. State, 947 S.W.2d 678, 680 (Tex. App.--Texarkana
1997, no pet.). If a proper objection was raised, reversal is required if the error is "calculated to
injure the rights of the defendant." Almanza, 686 S.W.2d at 171. In other words, an error that has
been properly preserved is reversible unless it is harmless. Id. If a defendant does not object to the
charge, reversal is required only if the harm is so egregious that the defendant has not had a fair and
impartial trial. Rudd v. State, 921 S.W.2d 370, 373 (Tex. App.--Texarkana 1996, pet. ref'd).

 Under the instruction contained in the jury charge, the receipt itself would fall easily within
the definition of a "commercial instrument." But in testing this evidence by comparing it to a
hypothetically-correct jury charge (which would include an instruction having a correct definition
of "other commercial instrument" as we have suggested), the evidence is insufficient to support the
verdict of the jury because there was no evidence that the receipt either granted or ceded any present
or future right or benefit. As a consequence, the erroneous instruction made the difference between
a guilty verdict and one that would be legally insufficient to support a finding of guilt. Under these
circumstances, therefore, egregious harm resulted. 

 Accordingly, the evidence was legally insufficient to support a conviction for forgery of a
commercial instrument. Because the jury was not charged on the lesser offense of forgery, we need
not decide whether there was sufficient evidence to support a conviction on that offense. See Thorpe
v. State, 831 S.W.2d 548, 552 (Tex. App.--Austin 1992, no pet.). 

 [A] court of appeals may reform a judgment of conviction to reflect conviction of a
lesser included offense only if (1) the court finds that the evidence is insufficient to
support conviction of the charged offense but sufficient to support conviction of the
lesser included offense and (2) either the jury was instructed on the lesser included
offense (at the request of a party or by the trial court sua sponte) or one of the parties
asked for but was denied such an instruction. 

Haynes v. State, 273 S.W.3d 183, 185 (Tex. Crim. App. 2008). 

 We reverse the judgment as to Shipp's conviction and render an acquittal in this cause
number. 



 Bailey C. Moseley

 Justice


Date Submitted: April 27, 2009

Date Decided: July 23, 2009


Publish


1. In a single appeal, Shipp challenges three convictions, obtained in a single trial, for
possession of a controlled substance; forgery of a government instrument; and this matter (forgery
of a commercial instrument). Please see our opinions in cause numbers 06-08-00122-CR and 06-08-00123-CR regarding the first two convictions. 
2. In the absence of a definition of "commercial instrument" in the Texas Penal Code, Shipp
invites us to employ the Texas Business and Commerce Code's definitions of "instrument." See Tex.
Bus. & Com. Code Ann. §§ 3.104(b), 9.102(a)(47) (Vernon Supp. 2008). These essentially define
instrument as a negotiable instrument, although in the distinct contexts of negotiable instruments and
secured transactions, respectively. Further, the definitions of instrument as "a negotiable instrument
or any other writing that evidences a right to the payment of a monetary obligation" is not necessarily
consistent with the other examples of specified writings in Section 32.21 of the Texas Penal Code
(see our discussion of ejusdem generis, below). Therefore, we decline Shipp's invitation to
transplant those definitions into this case. 
3. Cf. State v. LaPointe, 345 So.2d 362, 364 (Fla. Dist. Ct. App. 1977), finding forged football
tickets qualified as "receipt for money" under Florida forgery statute, which is substantially more
broad and inclusive than Section 32.21(d) of the Texas Penal Code. 
4. "For example, in the phrase horses, cattle, sheep, pigs, goats, or any other farm animal, the
general language or any other farm animal--despite its seeming breadth--would probably be held
to include only four-legged, hoofed mammals typically found on farms, and thus would exclude
chickens." Black's Law Dictionary 556 (8th ed. 2004).


         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-11-00117-CV

                                                ______________________________

 

 

                                                                  

              THE STATE OF TEXAS FOR THE BEST INTEREST 

                                    AND
PROTECTION OF S.W.

                                                                  

 

 

                                                                                                  


 

 

                                          On Appeal from the County Court at Law #2

                                                              Hunt County, Texas

                                                          Trial Court
No. M-10152

 

                                                                
                                  

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                    Opinion by Chief Justice Morriss








                                                                   O P I N I O N

 

            On September
29, 2011, S.W., a twenty-five-year-old female, appeared in an emergency room in
Hunt County complaining of suicidal thoughts and acting aggressively toward
emergency-room staff.[1]  Diagnosed with schizoaffective disorder and
as bipolar, S.W. has been involuntarily committed to inpatient mental health treatment.[2]  Because we find no evidence in the record of
a recent overt act or continuing pattern of behavior that tends to confirm the likelihood
of serious harm to S.W. or a substantial deterioration of S.W.s ability to
function independently to provide for her basic needs, we reverse the judgment
of the trial court.

            At the
October 17, 2011, hearing on the States application for court-ordered extended
mental health services,[3]
the trial court found that S.W. was mentally ill and that, as a result of her
mental illness, she was likely to cause serious harm to herself.  The trial court further found that S.W.
will, if not treated, continue to suffer severe and abnormal mental, emotional
or physical distress and will continue to experience deterioration of the
ability to function independently and is unable to make a rational and informed
decision as to whether or not to submit to treatment.  

            A trial court may order the
temporary inpatient mental health services of a proposed patient only if the
fact-finder concludes, from clear and convincing evidence, that the proposed
patient is mentally ill and also satisfies at least one of the subparagraphs
(A), (B), or (C) of Section 574.034(a)(2) of the Texas Health and Safety
Code, requiring that the proposed patient, due to the mental illness:

            (A)       is likely to cause serious harm to
himself;

 

            (B)       is likely to cause serious harm to
others; or

 

            (C)       is:

 

                        (i)         suffering severe and abnormal mental,
emotional, or physical distress;

 

                                                (ii)        experiencing substantial mental or
physical deterioration of the proposed patients ability to function
independently, which is exhibited by the proposed patients inability, except
for reasons of indigence, to provide for the proposed patients basic needs,
including food, clothing, health, or safety; and

            

                                                (iii)       unable to make a rational and informed
decision as to whether or not to submit to treatment.

 

Tex. Health &
Safety Code Ann. § 574.034(a)(2) (West 2010).  If the trial court finds that the proposed
patient meets the prescribed commitment criteria, it must then specify which
criterion forms the basis of the decision. 
Tex. Health & Safety Code Ann.
§ 574.034(c) (West 2010).  Here, mental
illness is not disputed, and there is no claim S.W. is a threat to others.  Rather, S.W. contends the evidence is legally
insufficient to establish, by clear and convincing evidence, a recent overt act
or a continuing pattern of behavior that tends to confirm (1) that S.W. was
likely to cause serious harm to herself or (2) S.W.s distress and the
deterioration of her ability to function. 
See Tex. Health & Safety Code Ann. § 574.034(a)(2)(A), (C).

            [A] State cannot
constitutionally confine without more a nondangerous individual who is capable
of surviving safely in freedom by himself or with the help of willing and
responsible family members or friends.  OConnor
v. Donaldson, 422 U.S. 563,
576 (1975).  The requirements for an
involuntary commitment are strict because an involuntary commitment is a
drastic measure.  In re Breeden, 4 S.W.3d 782, 789 (Tex. App.San
Antonio 1999, no pet.).  The evidentiary
standards for involuntary commitment are high.  State ex rel. E.E., 224 S.W.3d 791, 794 (Tex. App.Texarkana
2007, no pet.); Harris v. State,
615 S.W.2d 330, 333 (Tex. Civ. App.Fort Worth 1981, writ refd n.r.e.).  The State has the burden of establishing by
clear and convincing evidence that the proposed patient meets at least one of
the additional criteria listed in Section 574.034(a)(2) of the Texas Health and
Safety Code.  State ex rel. L.H., 183 S.W.3d 905, 909 (Tex. App.Texarkana 2006,
no pet.).  Clear and convincing evidence
is that measure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.  Tex. Civ. Prac. & Rem. Code Ann.
§ 41.001(2) (West 2008); State v.
K.E.W., 315 S.W.3d 16, 20 (Tex. 2010). 

            To
be clear and convincing, the evidence must include, unless waived, expert
testimony and evidence of a recent overt act or a continuing pattern of
behavior that tends to confirm (1) the likelihood of serious harm to the
proposed patient or to others; or (2) the proposed patients distress and the
deterioration of the proposed patients ability to function.  Tex.
Health & Safety Code Ann. § 574.034(d) (West 2010).  The threat of harm must be substantial and
based on actual dangerous behavior manifested by some overt act or threats in
the recent past.  Id.; State ex rel. K.D.C., 78
S.W.3d 543, 547 (Tex. App.Amarillo 2002, no pet.).  Further, evidence that a person has a mental
illness or is exhibiting psychotic behavior alone is insufficient to justify
commitment on the grounds of mental distress and the deterioration of the
ability to function independently.  T.G. v. State, 7 S.W.3d 248, 252 (Tex.
App.Dallas 1999, no pet.).

            Because
the States burden of proof is clear and convincing evidence, we apply a
heightened standard of review.  See
K.E.W., 315 S.W.3d at 20; In
re C.H., 89 S.W.3d 17, 25
(Tex. 2002).  To review the legal
sufficiency of the evidence where the burden of proof is clear and convincing
evidence, we review all the evidence in the light most favorable to the finding
to determine whether a reasonable fact-finder could have formed a firm belief
or conviction that the finding was true.  See K.E.W., 315 S.W.3d at 20.  Disputed
fact questions are resolved in favor of the finding if a reasonable fact-finder
could have done so.  Contrary evidence is
disregarded unless a reasonable fact-finder could not have done so.  City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex. 2005).

            Paul
Lee, a medical doctor specializing in psychiatry, is a member of S.W.s
treatment team.  Having evaluated S.W. in
excess of ten times, Lee determined that S.W. suffered from schizoaffective
disorder of the bipolar-type.  Lee opined
that S.W. suffers from a combination of mood and thought disorder.  The thought disorder represents distortions
in thought, delusions, [and] hallucinations. 
The mood disorder of the bipolar type results in very intense periods of
euphoria and intense periods of depression. 
Lee expressed great concern over the hallucinatory activity.  S.W. experienced frequent auditory hallucinations
that expressed telling her to do things, telling her to hurt herself.[4]  S.W. also experienced persecutory delusions,
in which she feels like people are trying to hurt her.  One example of this type of delusion occurred
during S.W.s hospitalizationshe reported that a peer followed her onto the
unit intending to sexually assault her. 
S.W. expressed a belief that this peer killed his mother and intended to
kill all of the people on the unit.[5]  

            Undeniably,
Lees testimony tracked the language found in Section 574.034.  However, an expert opinion recommending
involuntary commitment must be supported by the factual bases on which it is
grounded and not simply recite the statutory criteria.  See K.T. v. State, 68 S.W.3d 887, 893 (Tex. App.Houston
[1st Dist.] 2002, no pet.); Breeden, 4 S.W.3d at 784.  The
expert should describe the patients specific behaviors on which his or her
opinion is based.  See K.D.C., 78 S.W.3d at 550.  Even when the evidence establishes that an
individual is mentally ill and in need of hospitalization, such evidence does
not meet the statutory standard for involuntary commitment.  K.T., 68 S.W.3d at 892. 
Moreover, psychotic behavior is not evidence of a continuing pattern of
behavior that tends to confirm the likelihood of serious harm to [the proposed
patient] or others.  K.D.C., 78 S.W.3d at 547 (quoting T.G., 7 S.W.3d at 252).

            Lee
testified that, as a result of mental illness, S.W. is likely to cause serious
harm to herself.  This opinion is based
on the report of auditory hallucinations telling S.W. to harm herself.  In order to justify committing a patient to a
mental health facility against his or her will, the threat of harm to the
patient or others must be substantial and based on actual dangerous behavior
manifested by some overt act or threats in the recent past.  K.D.C.,
78 S.W.3d at 547.  The record indicates
only that S.W. may have had suicidal thoughts.[6]  S.W. advised the court that she was not
hearing voices and that she had no intention of harming herself.[7]  Moreover, the record fails to indicate that
S.W. engaged in any recent overt act to actually harm herself.  See In
re P.W., 801 S.W.2d 1, 2 (Tex. App.Fort Worth 1990, writ denied)
(reversing commitment order despite evidence that P.W. called cousin asking
about how to hold pistol to kill herself without causing a lot of pain).  Here, there is no indication S.W. actually
took steps to implement any suicidal thoughts she may have experienced.  There is no evidence S.W. attempted suicide
or purposely harmed herself.  Moreover,
S.W. has not demonstrated a pattern of behavior that tends to confirm she wants
to commit suicide.  See State ex rel. Best Interest & Protection of J.T., No. 06-08-00007-CV,
2008 WL 617513, at *8 (Tex. App.Texarkana Mar. 7, 2008, no pet.) (mem. op.)
(patient engaged in pattern of attempting suicide that included an almost
successful attempt).

            Although no
evidence suggests that S.W. has attempted to harm herself directly, the State nevertheless claims that S.W.s intrusive and
aggressive behavior is likely to result in serious harm to S.W. because such
behavior may incite others to harm her.[8]  Lee testified that S.W. suffered from persecutory
delusions and that she feels as if others are trying to hurt her.  On multiple occasions while on the unit, S.W.
became agitated, uncontrollable, and intrusive with other patients and with
staff.  As a result of this behavior, Lee
opined that S.W. might invite injury to herself.[9]  

            The
State relies on State v. K.E.W., 315
S.W.3d 16 (Tex. 2010), in arguing that behavior that could invite injury to
S.W. is sufficient to satisfy the statutory requirement that she is likely to
cause serious harm to herself.  In K.E.W., the proposed patient was
diagnosed with schizophrenia.  Id. at 18.  On a visit to the mental health center as a
patient, K.E.W. stated that he wanted to impregnate some of the centers female
staff and repeatedly asked for a particular staff member.  Id.  K.E.W. was then taken to the emergency room,
where he explained to physicians that he had been chosen to help populate a new
race of humans and that there was a group of women he planned to find and
impregnate, including his adult stepdaughter. 
Id.

            K.E.W.s
treating physician testified at his commitment hearing that, even though K.E.W.
 never expressed any intention to
impregnate anyone against her will, the physician did not know, given
[K.E.W.s] state of mind, if he would understand that no means no.  Id.
at 2425.  The court of appeals reversed
the trial courts order of temporary inpatient commitment, finding there was no
evidence of an overt act or continuing pattern of behavior that tended to
confirm either the deterioration of K.E.W.s ability to function independently
or that he was likely to cause serious harm to others.  Id.

            The high
court reversed, finding sufficient evidence of an overt act.

 

[T]he statute requires evidence of a recent act
by the proposed patient, either physical or verbal, that can be objectively
perceived and that is to some degree probative of a finding that serious harm
to others is probable if the person is not treated.  The overt act itself need not be of such
character that it alone would support a finding of probable serious harm to
others.  See Tex. Health & Safety Code §
573.034(d)(1).

 

K.E.W., 315 S.W.3d
at 24.

 

            The State
contends that S.W.s intrusive and aggressive behavior on multiple occasions
while on the unit establishes a continuing pattern of behavior which could
invite serious harm to S.W.  This
continuing pattern of behavior, the State maintains, is to some degree probative
of a finding of serious harm.  While it
may be probative of some danger, that is not the standard expressed by the
Texas Supreme Court.  That expressed
standard requires that the overt act or pattern of conduct be to some degree
probative of a finding that serious harm to others is probable if the person is not treated.[10]  Id.
at 24.  Here, Lee testified that the
multiple occasions while on the unit in which S.W. became agitated to the
point that she was uncontrollable and very intrusive with other patients on the
unit and with staff caused him to conclude that she might invite injury to
herself.  Evidence that S.W.s
aggressive behavior might invite
injury falls short of evidence that serious harm to S.W. is probable in the absence of
treatment.  We, therefore, decline to
apply the concept of invited injury, as the evidence is insufficient to
support such a determination.[11]

            Because
there is no evidence of a recent overt act or continuing pattern of behavior
that tends to confirm that S.W. is likely to cause serious harm to herself, we
conclude that the evidence is legally insufficient to support that avenue to involuntary
commitment.  See Tex. Health & Safety Code Ann. §
574.034(a)(2)(A), (d)(1).

            There is
another ground on which the commitment could be affirmed.  The trial court found that
S.W. will, if not treated, continue to suffer severe and abnormal mental,
emotional or physical distress and will continue to experience deterioration of
the ability to function independently and is unable to make a rational and
informed decision as to whether or not to submit to treatment.  

            Lee
testified that S.W. is unable to make a rational, informed decision as to
whether to submit to treatment.  A person
is dangerous to himself or herself if he or she cannot make a rational decision
to receive treatment.  The threat results
from an inability to seek treatment which might improve her condition.  L.S. v.
State, 867 S.W.2d 838, 843 (Tex. App.Austin 1993, no pet.); Johnson v.
State, 693 S.W.2d 559, 563
(Tex. App.San Antonio 1985, no writ).

            While
S.W. may not always be in a position to make a rational decision to receive
treatment, the evidence indicates that she is not alone to make such a
decision.  C.W., S.W.s husband,
testified that he would take S.W. to her psychiatristDr. Burgoswhen the need
arises, and will make certain S.W.s medications are refilled in a timely
manner.  If S.W. were to ever exhibit any
suicidal tendencies, C.W. testified that he would get help immediately.  C.W. does the cooking and the cleaning, and
generally looks after and takes care of S.W. 

            The
record suggests that S.W. is capable of surviving safely in freedom by herself
with the help of C.W.  Her inability to
make a rational decision on her own to receive treatment is thus not a factor
which mitigates in favor of concluding that S.W. should be confined against her
will on this basis.  See Tex. Health & Safety
Code Ann. § 574.034(a)(2)(C); OConnor,
422 U.S. at 576.

            Lee further
testified that, if not treated, S.W. will continue to suffer from mental
illness, which will continue to worsen over time.  Currently, S.W. is receiving treatment.  C.W. testified that he will make sure S.W.s
medications are refilled in a timely fashion and that he will seek treatment
for S.W. whenever necessary.  Finally,
Lee testified that S.W. is able to provide for her basic needs.  

            Moreover, evidence
of hallucinations or delusions, without more, is insufficient to justify
involuntary commitment on the grounds of mental distress and the deterioration
of the ability to function independently.  E.R., 287 S.W.3d 297, 306 (Tex. App.Texarkana 2009, no pet.).  Evidence of S.W.s delusions and hallucinations
confirm that S.W. is mentally ill.  However,
an expert medical diagnosis of mental illness alone is not enough to support
involuntary commitment.   E.E., 224 S.W.3d at 794; see
Armstrong v. State,
190 S.W.3d 246, 252 (Tex. App.Houston [1st Dist.] 2006, no pet.) (evidence of
effects of mental illness does not necessarily establish evidence of
substantial mental or physical deterioration unless effects impair ability to
function independently or provide basic needs); see also T.G., 7 S.W.3d at 25152 (physicians
diagnosis that appellant suffered from psychosis NOS not sufficient to
support commitment).  Lees testimony,
required under the statute to support commitment, does not provide evidence of
a recent overt act or a continuing pattern of behavior confirming S.W.s distress
and deterioration of her ability to function. 

            The facts on which Lee has based
his conclusions do not present clear and convincing evidence to support the
trial courts order.  Therefore, this
record does not support the findings required by Section 574.034 of the Texas
Health and Safety Code by clear and convincing evidence, because there was no
evidence of a recent overt act or continuing pattern of behavior that tends to
confirm the likelihood of serious harm to S.W. or a substantial deterioration
of S.W.s ability to function independently to provide for her basic
needs.  See Tex. Health & Safety
Code Ann. § 574.034(a), (d)(1), (2).

            We reverse
the trial courts judgment and render judgment denying the States application
for mental health services.  Having been
advised by S.W.s counsel that S.W. has already been released, we need not
order that release.  See Tex. Health & Safety
Code Ann. § 574.033(b) (West 2010); see also Tex. R. App. P.
43.2(c).

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          December
8, 2011

Date Decided:             December
9, 2011











[1]On
that occasion, S.W. reported hearing voices telling her to kill herself and was
agitated and threatening to the emergency room staff.  Approximately three or four days before the
September 29 incident, S.W. had quit taking certain prescription medications after
complaining of abdominal pain, stomach cramps, constipation, nausea, headaches,
ear pain, and hearing difficulties.  

 





[2]According
to S.W.s counsel, S.W. has now been released by her attending psychiatrist and
is residing at her home with her husband.

 





[3]The
trial court took judicial notice of the courts file, which contained two
physicians certificates of medical examination for mental illness.  The first certificate, dated September 29,
2011, was signed by Paul Lee, M.D., of Hunt Regional Medical Center.  The certificate indicates that S.W. has been
hearing voices telling her to kill herself and that she is extremely agitated
and has no insight.  The certificate
further reflects the fact that S.W. is voicing suicidal thoughts and gives a
diagnosis of schizoaffective disorder, bipolar-type.  The second certificate, dated October 16,
2011, was signed by Dante Burgos, M.D., of Hunt Regional Medical Center.  The certificate indicates that S.W. is
reporting auditory hallucinations telling her to kill herself, is experiencing
hopelessness and suicidal thoughts, and is refusing and/or is resistant to
taking needed medications.  This
certificate reflects a diagnosis of schizophrenia, undifferentiated type vs.
schizoaffective disorder.  While the
trial court could not properly take judicial notice of the truth of the
allegations contained within the certificates, it was proper to take judicial
notice of the file to show the documents were part of the courts files, that
they were filed on a certain date, and that the documents were before the court
at the time of the hearing.  See Tex.
R. Evid. 201; Fuller v. State,
30 S.W.3d 441, 445 (Tex. App.Texarkana 2000, pet. refd).





[4]Both
certificates of medical examination for mental illness indicate that S.W.
reported experiencing suicidal thoughts. 
Because the certificates were not admitted as evidence at trial, they
cannot be considered in the determination of whether temporary mental health
services should be ordered.  See Tex.
Health & Safety Code Ann. § 574.034(f) (West 2010).





[5]This
allegation was investigated and determined to be baseless.  

 





[6]In
this regard, Lee testified that S.W. reported frequent auditory hallucinations
that expressed telling her to do things, telling her to hurt herself.  C.W., S.W.s husband, testified that S.W.
never said anything to him about suicide and he did not believe S.W. was
suicidal. 

 





[7]S.W.
advised the trial court through her attorney that she was too nervous to speak
in the courtroom and wanted her attorney to tell the judge what she would tell
the court.  There was no objection by the
State and the court permitted S.W. to offer her communications through her
attorney.  

 





[8]The
State takes the position that the relevant overt act is an assault allegedly
committed by S.W. in which S.W. was responding to feelings of somebody trying
to hurt her or do bad things to her. 
The record, however, provides no details of any alleged assault.  Moreover, Lee specifically testified that it
is not likely that S.W. will cause serious harm to others.  Because there is no
evidence that an alleged assault is probative of a finding that serious harm to
S.W. or to others is probable, the record does not support the imposition of
temporary mental health services on that basis.

 





[9]In
spite of this opinion, there is no indication in the record that S.W. suffered
harm or injury as a result of her delusions or intrusive behavior.  Lee testified that it is unlikely that S.W.
would harm others. 

 





[10]This
standard applies to Section 573.034(d)(1) of the Texas Health and Safety
Code.  See K.E.W., 315 S.W.3d at 23. 
Section 573.034(d)(1) provides that clear and convincing evidence must
include, among other things, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm . . . the likelihood of serious harm
to the proposed patient or others. . . . 
Tex. Health & Safety Code
Ann. § 574.034(d)(1).  While
K.E.W. applied the probable-harm standard only to an evaluation of danger to
third parties, we see no reason that a different standard should be applied in
evaluating the likelihood of danger to the proposed patientespecially
considering the statutory language.

 





[11]The
concept of invited injury has heretofore been applied by Texas appellate
courts on a limited basis in involuntary commitment cases.  See
Taylor v. State, 671 S.W.2d 535, 538
(Tex. App.Houston [1st Dist.] 1983, no writ) (proposed patients hostile and
provocative behavior toward family and others could foreseeably result in
injury to the proposed patient, thus placing proposed patient in need of
hospitalization for his or her own protection); Seekins v. State, 626 S.W.2d 97, 99 (Tex. App.Corpus Christi 1981,
no writ) (proposed patients behavior of making obscene gestures and directing
profanity at passers-by, shouting of obscenities with clenched fists to
customers at store, and goosing female customers is provocative conduct which
could result in physical danger to proposed patient); Reed v. State, 622 S.W.2d 910, 911 (Tex. App.Fort Worth 1981, no
writ) (proposed patients violent behavior toward others required submission to
treatment for her own welfare and protection and/or protection of others).  These cases all predate K.E.W. and might be seen as violating its probable-harm standard.