In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00124-CV

                                                ______________________________

 

 

 

                               THE
STATE OF TEXAS FOR THE BEST

                               INTEREST AND PROTECTION OF E.R.

 

 

                                                                                                  


 

 

                                       On Appeal from the County
Court at Law No. 2

                                                              Hunt County, Texas

                                                          Trial Court
No. M-09853

 

                                                             
                                     

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                      MEMORANDUM OPINION

 

            In
this accelerated appeal, we are called upon to determine whether the evidence
is legally sufficient to support the trial court’s order committing E.R. to
receive inpatient mental health services for a period of not more than ninety
days.  Because we find the evidence to be
legally insufficient to support the commitment order, we reverse the judgment
of the trial court and render judgment denying the application for
court-ordered temporary mental health services. 


I.          FACTUAL BACKGROUND

            E.R. is a
thirty-eight-year-old female who has been diagnosed with chronic paranoid
schizophrenia, an illness with which she has struggled for a lengthy period of
time.  In the thirty- to sixty-day period
prior to the implementation of court-ordered temporary mental health services,
E.R. would not let her mother, who regularly brings her groceries, into the
apartment where E.R. resides.  E.R.’s
mother was able to enter the apartment the day prior to E.R.’s evaluation,
however.  At that time, the apartment was
extremely unclean, and smelled bad. 
According to her mother, E.R. suffered from swine flu the year prior to
her hospitalization, and while E.R. was doing well prior to that time, E.R.’s
condition has deteriorated since then and she has been suffering from
seizures.  E.R.’s seizures cause extreme
headaches, but do not cause her to shake or to lose consciousness.  E.R. refuses to take her anti-psychotic
medication as she believes it to be poison.  After some initial complaints that her
anti-seizure medication was also poisoned, E.R. has resumed taking her Dilanton
and has acknowledged her need to take Dilanton for the remainder of her
life.  According to her mother, E.R. lost
twenty to thirty pounds “here recently.” 

            The
jury in E.R.’s case found from clear and convincing evidence that E.R. was
mentally ill and that as a result of such mental illness, she is likely to
cause serious harm to herself.  The jury
further found that as a result of her mental illness, E.R. was suffering severe
and abnormal mental, emotional, or physical deterioration of her ability to
function independently, exhibited by her inability, except for reasons of
indigence, to provide for her basic needs, including food, clothing, health, or
safety, and that E.R. was not able to make a rational and informed decision as
to whether to submit to treatment.  

II.        APPLICABLE LAW

            A.        Statutory Requirements

            A
trial court may order the temporary inpatient mental health services of a
proposed patient only if the fact-finder concludes, from clear and convincing
evidence, that the proposed patient is mentally ill, and also satisfies at
least one of subparagraphs (A), (B), and (C) of Section 574.034(a)(2) of the
Texas Health and Safety Code:

(2)        as
a result of that mental illness the proposed patient:

            (A)       is likely to cause serious harm to
himself;

            (B)       is likely to cause serious harm to
others; or

            (C)       is:

                        (i)         suffering severe and abnormal mental,
emotional, or physical distress;

                        (ii)        experiencing substantial mental or
physical deterioration of the proposed patient’s ability to function
independently, which is exhibited by the proposed patient’s inability, except
for reasons of indigence, to provide for the proposed patient’s basic needs, including
food, clothing, health, or safety; and

                        (iii)       unable to make a rational and informed
decision as to whether or not to submit to treatment.

 

Tex.
Health & Safety Code Ann. § 574.034(a)(2) (Vernon 2010).  If the judge or jury finds that the proposed
patient meets the prescribed commitment criteria, it must then specify which
criterion forms the basis of the decision. 
Tex. Health & Safety Code
Ann. § 574.034(c) (Vernon 2010). 
Here, mental illness is not disputed, and there is no claim E.R. is a
threat to others.  Rather, E.R. contends
that the evidence was insufficient to support the findings that she was likely
to cause serious harm to herself and that she experienced mental or physical
deterioration to the point that she cannot function independently due to the
inability to provide for her basic needs, including food, clothing, health, or
safety.  See Tex.
Health & Safety Code Ann. § 574.034(a)(2)(A), (C).  The court’s written order affirmatively found
the State’s allegations under subsections 2(A) and 2(C) to be true.  

            B.        The State’s Burden

            “[A] State cannot
constitutionally confine without more a nondangerous individual who is capable
of surviving safely in freedom by himself or with the help of willing and
responsible family members or friends.”  O’Connor v. Donaldson, 422 U.S. 563, 576
(1975).  The requirements for an
involuntary commitment are strict because an involuntary commitment is a
drastic measure.  In re Breeden, 4 S.W.3d 782, 789 (Tex. App.—San
Antonio 1999, no pet.).  The evidentiary standards for
involuntary commitment are high.  State ex rel. E.E., 224 S.W.3d 791, 794
(Tex. App.––Texarkana 2007, no pet.); Harris
v. State, 615 S.W.2d 330, 333 (Tex. Civ. App.––Fort Worth 1981, writ ref’d
n.r.e.).  The State has the burden of
establishing by clear and convincing evidence that the proposed patient meets
at least one of the additional criteria listed in Section 574.034(a)(2).  State
ex rel. L.H., 183 S.W.3d 905, 909 (Tex. App.––Texarkana 2006, no pet.); Mezick v. State, 920 S.W.2d 427, 430
(Tex. App.––Houston [1st Dist.] 1996, no writ). 
Clear and convincing evidence is that measure or degree of proof that
will produce in the mind of the trier of fact a firm belief or conviction as to
the truth of the allegations sought to be established.  Tex.
Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 2008); State v. K.E.W., 315 S.W.3d 16, 20 (Tex.
2010); State v. Addington, 588 S.W.2d
569, 569, 570 (Tex. 1979).  Section
574.034(d) specifically requires that, to be clear and convincing, the evidence
must, unless waived, include expert testimony and evidence of a recent overt
act or a continuing pattern of behavior that tends to confirm “(1) the
likelihood of serious harm to the proposed patient or others; or (2) the
proposed patient’s distress and the deterioration of the proposed patient’s
ability to function.”  Tex. Health & Safety Code Ann. §
574.034(d) (Vernon 2010).  The overt act
or continuing pattern of behavior “must relate to the criterion on which the
judgment is based.”  J.M. v. State, 178 S.W.3d
185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  The threat of harm must be substantial and
based on actual dangerous behavior manifested by some overt act or threats in
the recent past.  Id.; State ex rel. K.D.C.,
78 S.W.3d 543, 547 (Tex. App.––Amarillo 2002, no pet.).

            C.        Standards of Review

            Because
the State’s burden of proof is clear and convincing evidence, we apply a
heightened standard of review.  See K.E.W.,
315 S.W.3d at 20; In re C.H., 89
S.W.3d 17, 25 (Tex. 2002).  To review the
legal sufficiency of the evidence where the burden of proof is clear and convincing
evidence, we review all the evidence in the light most favorable to the finding
to determine whether a reasonable fact-finder could have formed a firm belief
or conviction that the finding was true. 
See K.E.W., 315 S.W.3d at 20; In re J.F.C., 96 S.W.3d 256, 262–66
(Tex. 2002).  Disputed fact questions are
resolved in favor of the finding if a reasonable fact-finder could have done
so, and we disregard all contrary evidence unless a reasonable fact-finder
could not have done so.  City of Keller v. Wilson, 168 S.W.3d
802, 817 (Tex. 2005); see J.F.C., 96 S.W.3d at 267–68.

III.       ANALYSIS

            While
E.R. does not challenge the determination that she was mentally ill, she does
challenge the evidence supporting the findings required pursuant to Section
574.034, arguing that the State failed to present sufficient evidence of a
recent overt act or continuing pattern of behavior that tends to confirm the
likelihood of serious harm to E.R. or that tends to confirm E.R.’s distress and
the deterioration of her ability to function. 

            We
examine the record to determine the existence of evidence of a recent overt act
or a continuing pattern of behavior that confirms that E.R. is likely to harm
herself or that tends to confirm E.R.’s distress and the deterioration of her
ability to function.  Gurjeet Kalra is a
medical doctor specializing in psychiatry and is a member of E.R.’s treatment
team.  Kalra performed a psychiatric
evaluation and diagnosed E.R. with chronic paranoid schizophrenia, as a result
of which E.R. experiences symptoms of delusions, hallucinations, irritability,
and paranoia.  Kalra’s certificate of
medical examination states that E.R. is psychotic and reportedly is not able to
take care of herself, that she is “not eating and has lost 20 lbs,” and “according
to the emergency detention paper work, they have seen maggots in the patient’s
toilet.”  Kalra added notations to his
certificate that concerned E.R.’s visual and auditory hallucinations, agitated
behavior, making paranoid statements, threatening to “see you in court,” poor
dress and grooming, refusal to take medication, and poor insight and
judgment.  These notations do not reveal
the significance of the noted actions. 

            Dr.
Dante Burgos’ certificate of medical examination cited the following details as
support for his opinion that E.R. is likely to cause serious harm to
herself:  “erratic and aggressive
behavior.”  Burgos added notations to his
certificate that concerned E.R.’s paranoia as evidenced in such statements as “Dr.
Kalra is trying to expose himself,” “Ya’ll are selling my drugs,” “My mother is
stealing my money,” and that E.R. threatened a caseworker and her mother, has
auditory hallucinations, and has refused to take her medications for
weeks.  Again, these notations do not
reveal the significance of the noted actions.[1]  

            An
expert opinion recommending involuntary commitment must be supported by the
factual bases on which it is grounded and not simply recite the statutory
criteria.  J.M., 178 S.W.3d at 193. 
Rather, the expert must describe the patient’s specific behaviors on
which his or her opinion is based.  See K.D.C., 78 S.W.3d at 550.  Evidence establishing that an individual is
mentally ill is not evidence that the statutory standard for involuntary
commitment has been satisfied.  J.M., 178 S.W.3d at 193.  We examine the evidence offered by the State
in light of these principles to determine whether the record reflects clear and
convincing proof that E.R. should be subject to temporary mental health
services.  

            A.        The Likelihood of Serious Harm to E.R.

            Kalra
testified that E.R. is likely to cause serious harm to herself, basing his
opinion on her refusal to take medication and her failure to eat.  Kalra’s certificate of medical examination
provided the following bases for his opinion that E.R. poses a risk of serious
harm to herself: patient is extremely psychotic and is reportedly not able to
take care of herself, her living conditions are less than acceptable, she is
not eating and has lost twenty pounds, and emergency detention paperwork notes
maggots in patient’s toilet.  Burgos’
certificate of medical examination cited the following details as support for
his opinion that E.R. is likely to cause serious harm to herself:  erratic and aggressive behavior.  He added notations to the certificate
regarding refusal of medication, paranoid ideation, loud paranoid speech, and
auditory hallucinations.  

            Many
of these behavioral characteristics, such as paranoid ideation, loud paranoid
speech, auditory hallucinations, and being “extremely psychotic” amount simply
to evidence confirming that E.R. is mentally ill.  As such, this evidence is insufficient to
meet the evidentiary standard for court-ordered mental health services.  C.O., 65 S.W.3d at 182.  Moreover,
psychotic behavior alone is insufficient to justify commitment, and is no
evidence of a continuing pattern of behavior that tends to confirm the
likelihood of serious harm to E.R.  See
T.G. v. State, 7 S.W.3d 248, 252 (Tex. App.––Dallas 1999, no pet.).

            There
is also evidence that, at some point, E.R. was not eating and had lost twenty
pounds.  According to Vivian Anderson,
E.R.’s mother, E.R. lost between twenty and thirty pounds “here recently.”  A proposed patient’s refusal to eat may be
sufficient evidence to support an order for temporary commitment when there is
specific evidence of the patient’s refusal and the resulting harm that refusal
has caused the proposed patient.  See State ex rel. Y.A-Y., No. 12-03-00242-CV,
2004 WL 35811, at *9 (Tex. App.––Tyler Jan. 8, 2004, no pet.) (mem. op.)
(complete refusal to eat or drink for several days could result in weight loss
and could lead to dehydration, failure of bodily functions, and death). 

            Conversely,
where there is no evidence that the refusal to eat results in harm to the
proposed patient, such evidence is insufficient to prove the likelihood of
serious harm to the patient.  See K.T. v. State, 68 S.W.3d 887, 893
(Tex. App.––Houston [1st Dist.] 2002, no pet.) (no evidence that refusal to eat
resulted in malnutrition or other harm); see
also Breeden, 4 S.W.3d at 788–89 (finding no evidence of overt act or
continuing pattern of behavior, even though doctors testified patient was not
eating properly and refusing medication, because medical testimony did not show
malnutrition, but did show patient’s dietary and medication decisions were
based on his concern for animal rights).

            Here,
we were only told that E.R. was not eating at some point and lost twenty or
thirty pounds “here recently.”  We have
been provided minimal information regarding E.R.’s refusal to eat.  For example, we are not told when E.R.
initially refused to eat, if that refusal is or was total or partial, how long
such refusal has been or was ongoing, or what ill health effects, if any, have
resulted from E.R.’s refusal to eat. 
When asked her opinion as to the cause of E.R.’s weight loss, Anderson
testified, “I really don’t know.  I don’t
know if it’s the brain lesions, is it the mental illness.”  The information regarding E.R.’s weight loss
is not supported by specifics and is not placed in any type of meaningful
context in order to determine whether E.R.’s weight loss did, in fact, result
in ill health consequences.  For some,
the loss of twenty pounds would be a health benefit, rather than a
detriment.  Absent the provision of
significant details such as the amount of the loss; the time period over which
the weight loss occurred; her current height and weight; and the detrimental
effects, if any, such weight loss had (or in reasonable medical probability
could have) on E.R.’s health, it would be speculative to conclude that E.R.’s
refusal to eat is evidence of an overt act that tends to confirm the likelihood
of serious harm to E.R.  

            Kalra
testified that it was reported that while E.R. was at home, she was “refusing
to eat,” and if not treated, there is a high probability that she may not eat,
which could result in her starvation. 
There is no evidence in the record, however, that E.R. has refused to
eat after detention at the hospital.[2]  The evidence does not support a finding that
E.R. has placed her health in jeopardy by failing to eat or to show a risk of
harm to E.R.  Evidence that the proposed
patient might cause serious harm to
herself is insufficient to satisfy the statutory requirements.  State
ex rel. E.R., 287 S.W.3d 297, 304 (Tex. App.––Texarkana 2009, no pet.);
see State ex rel. L.C.F., 96 S.W.3d 651, 657 (Tex. App.––El Paso
2003, no pet.).  

            Kalra
further testified that E.R. suffers from a seizure disorder.  E.R. takes Dilanton for her seizures, which
Anderson describes as more akin to severe headaches than what typically is
envisioned as a grand mal seizure.  In
other words, E.R.’s seizures do not cause her to convulse or to lose
consciousness.  Kalra testified that at
times, E.R. still refuses to take her Dilanton. 
Without it, she may have seizures. 
According to Kalra, there is the concern that she “will stop taking her
anti-seizure medicine and . . . she might have more frequent seizures.”  Kalra testified that “people do die because
of uncontrolled seizures or because of the seizure disorder.”  There is no testimony that E.R. is not taking
her Dilanton on a regular basis or that E.R. will experience uncontrolled
seizures in the circumstance she does not take her Dilanton.  Kalra’s testimony regarding what could happen in the future and the
generic statement that “people” die “because of uncontrolled seizures” is not
sufficient to satisfy the statutory requirement of clear and convincing
evidence of a recent overt act or continuing pattern of behavior that tends to
confirm the likelihood of serious harm to E.R. 
See L.C.F., 96 S.W.3d at 657.  

            Additional
testimony from Anderson regarding the risk of serious harm to E.R. revealed her
concern that E.R. might start a fire using the stovetop or oven.  This concern is based on statements from E.R.
that E.R. has, at some point in the past, left the stovetop or oven on while cooking.  We note that Anderson’s testimony does not
state when the stovetop or oven was left on, whether this occurred only once or
on more than one occasion, or whether dire consequences resulted.  As such, Anderson’s testimony is no evidence
of a recent overt act or a continuing pattern of behavior that tends to confirm
the likelihood of serious harm to E.R.  See T.G., 7 S.W.3d at 251 (a single possible
incident of leaving gas burners on was not evidence of recent overt act or
continuing pattern of behavior).

            Because
there is no evidence of a recent overt act or continuing pattern of behavior
that tends to confirm that E.R. is likely to cause serious harm to herself, we
conclude that the evidence is legally insufficient to support involuntary
commitment under Section 574.034(a)(2)(A). 
See Tex. Health & Safety Code Ann. § 574.034(a)(2)(A),
(d)(1).

            B.        Ability to Function Independently

            We next examine
the record for evidence of a recent overt act or a continuing pattern of
behavior that confirms the multifaceted finding under Section 574.034(a)(2)(C).[3]  For this evidence to meet the clear and
convincing standard, it must show a recent overt act or a continuing pattern of
behavior that tends to confirm the proposed patient’s distress and the
deterioration of the proposed patient’s ability to function.  Tex.
Health & Safety Code Ann. § 574.034(d)(2).  Kalra’s testimony suggested that E.R.’s
condition will deteriorate as a result of the cessation of medication for her
mental illness.  There is also some
testimony regarding E.R.’s living conditions and ability to function
independently.  We will discuss each item
of evidence in turn.

            First,
Kalra testified that E.R. has been prescribed Risperdal and Prolexian,
medications used in the treatment of schizophrenia.[4]  E.R. does not want to take the psychoactive
medication because she believes they worsen her condition.  Kalra opines that because E.R. has ceased
taking her psychoactive medications, she is overtly psychotic and has been
observed talking to herself and laughing inappropriately.  She experiences visual and auditory
hallucinations.  E.R. accused Kalra of
poisoning her food and her medicine and accused Kalra, along with Anderson, of
stealing her money.  Kalra opined that,
if left untreated, E.R.’s condition will continue to deteriorate to the point
where she will not be able to take care of herself.  “If untreated she will deteriorate to the
point she will be unable to meet her personal hygiene, grooming, feeding,
eating.”  This condition has been ongoing
since admission; Kalra has no knowledge of how long this behavior may have
existed prior to admission.  Because of
her psychotic condition at this time, Kalra opines that E.R. is unable to make
a rational and informed decision as to whether or not to submit to treatment. 

            Expert
opinions recommending involuntary commitment must be supported by a showing of
the factual bases on which they are grounded. 
J.M., 178 S.W.3d at 193.  Kalra’s
testimony, required under the statute to support commitment, does not provide
evidence of a recent overt act or a continuing pattern of behavior confirming
E.R.’s distress and deterioration of her ability to function.  Evidence of refusal to take medication alone
is insufficient evidence of an overt act or continuing pattern of behavior
tending to confirm a proposed patient’s distress or deterioration of the
ability to function.  E.R., 287 S.W.3d at 306; Armstrong v. State, 190 S.W.3d 246, 252–54 (Tex. App.—Houston [1st Dist.]
2006, no pet.).  Allowing the refusal of
treatment or medication to justify commitment has been classified as “tautological
reasoning”—one may be involuntarily committed and treated because the patient
does not consent to voluntary treatment. 
“[S]uch circular reasoning is not legally sufficient to support a
deprivation of [the patient’s] liberty by temporary involuntary commitment.”  J.M.,
178 S.W.3d at 195.  Moreover, evidence of
hallucinations or delusions without more is insufficient to justify involuntary
commitment on the grounds of mental distress and the deterioration of the
ability to function independently.  E.R., 287 S.W.3d at 306; C.O., 65 S.W.3d at 182.  Evidence of E.R.’s delusions and
hallucinations confirm that E.R. is mentally ill, and we do not question Kalra’s
conclusion that E.R. would benefit from hospitalization.  However, an expert medical diagnosis of
mental illness alone is not enough to support involuntary commitment.  E.E.,
224 S.W.3d at 794.  E.R.’s agitated
behavior, poor insight, judgment and paranoia are evidence of mental illness,
but these symptoms are insufficient to support a finding that involuntary commitment
on the grounds of mental distress and the ability to function independently is
warranted.  See Armstrong, 190 S.W.3d at 252 (evidence
of effects of mental illness does not necessarily establish evidence of
substantial mental or physical deterioration unless effects impair ability to
function independently or provide for basic needs); see also T.G., 7 S.W.3d at
251–52 (finding physician’s diagnosis that appellant suffered from “psychosis
NOS” not sufficient to support commitment). 
Evidence that merely reflects that an individual is mentally ill and in
need of hospitalization is no evidence the statutory standard has been
met.  K.T.,
68 S.W.3d at 893; Broussard v. State,
827 S.W.2d 619, 622 (Tex. App.––Corpus Christi 1992, no writ).  

            Further,
we note that Kalra testified in terms of future deterioration of E.R.’s
condition, to the point of being unable to meet her personal needs.  Evidence that the proposed patient will
experience substantial mental or physical deterioration in the future does not
establish the patient’s current inability to function.  See
Armstrong, 190 S.W.3d at 252–53 (evidence showed only that patient was
deteriorating due to her refusal to take medications for her chronic health
problems, not that she was currently experiencing substantial deterioration of
her ability to function independently). 

            Anderson
testified that she has taken E.R. in for treatment for psychiatric assistance
five times in the past four years.  E.R.’s
condition has become “extremely worse” than it was in the previous year.  Anderson testified that she does all of E.R.’s
grocery shopping because E.R. won’t leave her apartment.  Anderson delivers the groceries to E.R. at
her apartment.  When she last visited
E.R.’s apartment the day prior to E.R.’s psychiatric evaluation, there were
dishes piled all over the living room and in the kitchen, and there was trash
all over the floor.  Anderson pays E.R.’s
rent for her apartment, along with the electric bill.[5]  In addition, Anderson provides cash to E.R.
each week along with a roll of quarters so that she can do her laundry, but
E.R. does not do the laundry; instead, she spends the money on cigarettes. 

            Anderson’s
testimony reveals that E.R. does not live in a clean environment.  It also establishes that Anderson cares for
her daughter with respect to the tasks she performs on her behalf, but her
testimony does not affirmatively establish that E.R. is incapable of providing
for her basic needs, including “food, clothing, health, or safety.”  Tex.
Health & Safety Code Ann. § 574.034(a)(2)(C)(ii).  Said another way, Anderson’s testimony does
not provide clear and convincing proof of a recent overt act or continuing
pattern of behavior that tends to confirm deterioration of E.R.’s ability to
function independently.  See In re J.S.C., 812 S.W.2d 92, 95–96 (Tex.
App.––San Antonio 1991, no pet.).  

            J.S.C. involved a patient diagnosed with
chronic schizophrenia with acute exacerbation. 
Evidence that J.S.C. was found to be catatonic while at the clinic and
was hallucinating and delusional proved that he was mentally ill.  Id.
at 94.  While additional testimony that
J.S.C. was unable to care for himself outside of the hospital demonstrated by
inference his distress and deterioration of ability to function, such proof was
insufficient to support commitment because no specific facts were provided by
the examining physician in support of this statement.  Id.
at 96.  Likewise, no specific facts are
provided here in support of Kalra’s conclusion that, if left untreated, E.R.’s
condition will continue to deteriorate to the point where she will be unable to
take care of herself.

            Because
there is no evidence of an overt act or continuing pattern of behavior that
tends to confirm E.R.’s distress and a deterioration of her ability to function,
the evidence is legally insufficient to support this finding based on Section
534.034(a) of the Texas Health and Safety Code. 
Therefore, viewing the evidence in the light most favorable to the
finding, we conclude that a reasonable trier of fact could not have formed a
firm belief or conviction that this finding was true.  See
J.F.C., 96 S.W.3d at 266; cf. State ex rel. G.B., No. 06-06-00100-CV,
2006 WL 3492325, at *4 (Tex. App.––Texarkana Dec. 5, 2006, no pet.) (mem. op.) (evidence,
for example, that appellant woke up in motel room with man whose identity was
unknown to her and who managed to get into her room without her recalling how,
and who was trying to force sex on her, and who pieced together a story as best
she could to explain these bizarre events was suffering severe and abnormal
mental, emotional, or physical distress as well as substantial mental or
physical deterioration of her ability to function independently).

IV.       CONCLUSION

            We
reverse the trial court’s order and render judgment denying the State’s
application for mental health services. 
Having rendered such judgment, we accordingly order E.R.’s immediate
release from the institution to which she has been committed.  See
Tex. Health & Safety Code Ann.
§ 574.033(b) (Vernon 2010); see also Tex. R. App. P. 43.2(c).  Our mandate will issue immediately upon
motion, should appropriate action not be taken in accordance with this opinion.

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          January
5, 2011

Date Decided:             January
7, 2011











[1]To
the extent these notations provide support for Burgos’ opinion that E.R. is
likely to cause serious harm to others if not immediately restrained, we need
not consider them, in light of the fact the jury was not asked to make such a
finding.  Further, the recent overt act
or continuing pattern of behavior must relate to the criterion on which the
judgment is based.  State ex rel. C.O., 65 S.W.3d 175, 181 (Tex. App.––Tyler 2001, no
pet.).  Evidence of E.R.’s aggressiveness
or threatening behavior toward family or caseworkers does not tend to confirm
the likelihood that E.R. would cause serious harm to herself.





[2]An
order to detain E.R. and place her in the Hunt Regional Behavioral Hospital was
issued October 27, 2010.  Dr. Kalra
initially saw her October 28.  An order
was issued October 29 detaining E.R. in the hospital.  The jury trial was conducted November 8.  It appears E.R. had been detained at the
hospital from either October 28 or 29 until the hearing on November 8,
2010.  





[3]We
must find sufficient evidence of the following three elements:  (1) patient is suffering severe and abnormal
mental, emotional, or physical distress; (2) patient is experiencing
substantial mental or physical deterioration of the proposed patient’s ability
to function independently, which is exhibited by the proposed patient’s
inability, except for reasons of indigence, to provide for the proposed
patient’s basic needs, including food, clothing, health, or safety; and (3)
patient is unable to make a rational and informed decision as to whether or not
to submit to treatment.  Tex. Health & Safety Code Ann. §
574.034(a)(2)(C).  This must be shown by
evidence of a recent overt act or a continuing pattern of conduct that tends to
confirm:  (1) the likelihood of serious
harm to the proposed patient or others; or (2) the proposed patient’s distress
and the deterioration of the proposed patient’s ability to function.  Tex.
Health & Safety Code Ann. § 574.034(d). 

 





[4]E.R.
is taking her Dilanton for seizures most of the time.  





[5]E.R.
receives social security benefits and food stamps.